USDC SCAN INDEX SHEET

















KAJ   6/29/06   14:38

3:06-CV-01336   MILLER V. RAM

*1*

*CMP.*

1    ROBBINS UMEDA & FINK LLP
     BRIAN J. ROBBINS (190264)
2    STEVEN J. SIMERLEIN (156979)
     610 West Ash Street, Suite 1800
3    San Diego, CA 92101
     Telephone: 619/525-3990
4    Facsimile: 619/525-3991

5    Attorneys for Plaintiff

6

7

             UNITED STATES DISTRICT COURT
8
            SOUTHERN DISTRICT OF CALIFORNIA
9

| | |
|---|---|
| 10   CARIDAD MILLER, Derivatively On Behalf of INFOSONICS CORPORATION, ) | Case No. 06CV 1336   LAB BLM |
| 11                Plaintiff, ) | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF |
| 12       vs. ) | CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, |
| 13 ) | UNJUST ENRICHMENT AND VIOLATIONS OF THE SARBANES- |
| 14   JOSEPH RAM, JEFFREY A. KLAUSNER, JOSEPH C. MURGO, ABRAHAM G. ) | OXLEY ACT OF 2002 AND THE SECURITIES EXCHANGE ACT OF 1934 |
| 15   ROSLER, RANDALL P. MARX, ROBERT S. PICOW AND KIRK A WALDRON, ) | |
| 16              Defendants, ) | |
| 17     -and- ) | |
| 18 ) | |
| 19   INFOSONICS CORPORATION, a Maryland corporation, ) | |
| 20          Nominal Defendant. ) | DEMAND FOR JURY TRIAL |

21

22

23

24

25

26

27

28

1  Plaintiff, by her attorneys, submits this Verified Shareholder Derivative Complaint (the

2  "Complaint") against the defendants named herein.

3  ## NATURE OF THE ACTION

4  1.     This is a shareholder derivative action brought by a shareholder of InfoSonics

5  Corporation ("InfoSonics" or the "Company"), on behalf of the Company against certain of its

6  officers and directors seeking to remedy defendants' violations of state and federal law, including

7  breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets,

8  unjust enrichment, violations of California Corporations Code and violations of section 304 of the

9  Sarbanes-Oxley Act of 2002 ("SOX §304") and  section 14(a) of the Securities Exchange Act of

10  1934 (the "Exchange Act") that occurred between January 2006 and the present (the "Relevant

11  Period") and that have caused substantial losses to InfoSonics and other damages, such as to its

12  reputation and goodwill.

13  ## JURISDICTION AND VENUE

14  2.     This court has jurisdiction over this action pursuant to 28 U.S.C §1331 in that

15  plaintiff's claims arise in part out of the laws of the United States, including SOX §304 and section

16  14(a) of the Exchange Act.

17  2.     This Court also has subject matter jurisdiction over the pendant state law claims

18  asserted herein pursuant to 28 U.S.C. §1367, since this statute provides that the district court has

19  supplemental jurisdiction over all other claims where, as here, they are so related to claims in the

20  action within the original jurisdiction of the Court, that they form part of the same case or

21  controversy.

22  3.     This Court retains general jurisdiction over each named defendant who is a resident of

23  California.    Additionally, this Court has specific jurisdiction over each named non-resident

24  defendant because these defendants maintain sufficient minimum contacts with California to render

25  jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

26  InfoSonics is a citizen of California, and because the allegations contained herein are brought

27  derivatively on behalf of InfoSonics, defendants' conduct was purposefully directed at California.

28  Defendants' conduct arose out of California, where InfoSonics maintains its corporate headquarters.

1  Finally, exercising jurisdiction over any nonresident defendants is reasonable under these

2  circumstances.

3        4.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of

4  the defendants either resides in or maintains executive offices in this District, and a substantial

5  portion of the transactions and wrongs that are the subject of this Complaint, including the

6  defendants' primary participation in the wrongful acts detailed herein, aiding and abetting, and

7  conspiracy in violation of fiduciary duties owed to InfoSonics, occurred in substantial part in this

8  District. Finally, defendants have received substantial compensation in this District by doing

9  business here and engaging in numerous activities that had an effect in this District.

10                                       **SUMMARY OF THE ACTION**

11        5.     InfoSonics is a distributor of wireless handsets and accessories in the United States

12  and Latin America. InfoSonics provides end-to-end handset and wireless terminal solutions for

13  carriers in both the United States and Latin America.

14        6.     In January 2006, in connection with a sale of its common stock, InfoSonics issued

15  warrants to purchase shares of the Company's stock. Under the terms of the security purchase

16  agreement, the Company would be liable to potential purchasers for liquidated damages if it failed to

17  have the registration statement declared effective by the Securities and Exchange Commission

18  ("SEC"). Accordingly, upon the closing of the purchase agreement on January 30, 2006, the

19  defendants directed the Company to treat the warrants as derivative instruments and classify them as

20  liabilities for balance sheet purposes. On February 17, 2006, the Company's registration statement

21  registering the shares underlying the warrants was declared effective by the SEC extinguishing the

22  Company's liability to pay liquidated damages.

23        7.     As a result of the SEC's February 17 declaration of the effectiveness of the

24  registration statement, the Company was required under the Generally Accepted Accounting

25  Principals ("GAAP") to reclassify the warrant as equity. Defendants, including InfoSonics' Audit

26  Committee, however, directed InfoSonics to maintain the warrants' classification as a liability. As a

27  result, InfoSonics improperly booked $564,342 in net income for the period from February 17, 2006

28  to March 31, 2006 related to an increase in the market value of the warrants.

8.     The misclassification of the warrants increased InfoSonics' earnings for 1Q:06 by 32%. In turn, the inflation of the InfoSonics' earnings resulted in an artificial inflation of the Company's stock price, which certain of the defendants utilized to their advantage. Indeed, these defendants sold over 121,000 of their personally held shares for over $2.6 million in proceeds.

9.     On June 12, 2006, after defendants completed their insider sales, InfoSonics revealed that the warrants had been misclassified and that the Company's 1Q:06 earnings were overstated. Market reaction to the news was swift as InfoSonics' market capitalization was devastated by over $218 million. Specifically, InfoSonics' value fell $6.84 per share losing 28% of its value to close at $17.38 per share. As a further result of defendants' improprieties, the Company is now exposed to liability for violations of federal securities laws.

## THE PARTIES

10.     Plaintiff Caridad Miller is, and was at times relevant hereto, an owner and holder of InfoSonics common stock.

11.     Nominal defendant InfoSonics is a corporation organized and existing under the laws of the state of Maryland with its headquarters located at 5880 Pacific Center Blvd. San Diego, California. InfoSonics is a distributor of wireless handsets and accessories in the United States and Latin America. InfoSonics provides end-to-end handset and wireless terminal solutions for carriers in both the United States and Latin America.

12.     Defendant Joseph Ram ("Ram") is, and at all times relevant hereto was, Chairman of the Board of Directors (the "Board"), President, Chief Executive Officer ("CEO") and a director of InfoSonics. Because of Ram's positions, he knew or should have known the adverse, non-public information about the business of InfoSonics, specifically, the Company's improper classification of warrants, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Ram participated in the issuance of false and/or misleading statements, including the preparation of the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  false and/or misleading press releases and SEC filings.  InfoSonics paid defendant Ram the

2  following compensation during the Relevant Period:

| Defendant | Fiscal Year | Salary | Bonus | Other Compensation | Stock Options |
|---|---|---|---|---|---|
| Ram | 2005 | $275,000 | $150,000 | $15,480 | 25,000 |

5  During the Relevant Period, Ram sold 25,000 shares of InfoSonics stock for proceeds of

6  $428,797.50.

7      13.    Defendant Jeffrey A. Klausner ("Klausner") is, and at all times relevant hereto was,

8  Chief Financial Officer ("CFO") of InfoSonics.  Because of Klausner's position, he knew or should

9  have known the adverse, non-public information about the business of InfoSonics, specifically, the

10  Company's improper classification of warrants, as well as its finances, markets and present and

11  future business prospects, via access to internal corporate documents, conversations and connections

12  with other corporate officers and employees, attendance at management meetings and via reports and

13  other information provided to him in connection therewith.  During the Relevant Period, Klausner

14  participated in the issuance of false and/or misleading statements, including the preparation of the

15  false and/or misleading press releases and SEC filings.  InfoSonics paid defendant Klausner the

16  following compensation during the Relevant Period:

| Defendant | Fiscal Year | Salary | Bonus | Other Compensation | Stock Options |
|---|---|---|---|---|---|
| Klausner | 2005 | $150,000 | $75,000 | $0 | 170,000 |

19  During the Relevant Period, Klausner sold 26,000 shares of InfoSonics stock for proceeds of

20  $628,172.25.

21      14.    Defendant Joseph C. Murgo ("Murgo") is, and at all times relevant hereto was, the

22  Vice President of Sales of InfoSonics.  Because of Murgo's position, he knew or should have known

23  the adverse, non-public information about the business of InfoSonics, specifically, the Company's

24  improper classification of warrants, as well as its finances, markets and present and future business

25  prospects, via access to internal corporate documents, conversations and connections with other

26  corporate officers and employees, attendance at management meetings and committees thereof and

27  via reports and other information provided to him in connection therewith.  During the Relevant

28  Period, Murgo participated in the issuance of false and/or misleading statements, including the

- 4 -

1  preparation of the false and/or misleading press releases and SEC filings. InfoSonics paid defendant

2  Murgo the following compensation during the Relevant Period:

| Defendant | Fiscal Year | Salary | Bonus | Other Compensation | Stock Options |
|---|---|---|---|---|---|
| Murgo | 2005 | $100,000 | $54,231 | $0 | 40,000 |

5  During the Relevant Period, Murgo sold 55,000 shares of InfoSonics stock for proceeds of

6  $1,286,706.45.

7      15.    Defendant Abraham G. Rosler ("Rosler") is, and at all times relevant hereto was, the

8  Executive Vice President and a director of InfoSonics. Because of Rosler's positions, he knew or

9  should have known the adverse, non-public information about the business of InfoSonics,

10  specifically, the Company's improper classification of warrants, as well as its finances, markets and

11  present and future business prospects, via access to internal corporate documents, conversations and

12  connections with other corporate officers and employees, attendance at Board and management

13  meetings and committees thereof and via reports and other information provided to him in

14  connection therewith. During the Relevant Period, Rosler participated in the issuance of false and/or

15  misleading statements, including the preparation of the false and/or misleading press releases and

16  SEC filings. InfoSonics paid defendant Rosler the following compensation during the Relevant

17  Period:

| Defendant | Fiscal Year | Salary | Bonus | Other Compensation | Stock Options |
|---|---|---|---|---|---|
| Rosler | 2005 | $120,000 | $75,000 | $7,239 | 140,000 |

20  During the Relevant Period, Rosler sold 15,000 shares of InfoSonics stock for proceeds of

21  $307,005.41.

22      16.    Defendant Randall P. Marx ("Marx") is, and at all times relevant hereto was, a

23  director of InfoSonics. Because of Marx's position, he knew or should have known the adverse, non-

24  public information about the business of InfoSonics, specifically, the Company's improper

25  classification of warrants, as well as its finances, markets and present and future business prospects,

26  via access to internal corporate documents, conversations and connections with other corporate

27  officers and employees, attendance at Board meetings and committees thereof and via reports and

28  other information provided to him in connection therewith. During the Relevant Period, Marx

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   participated in the issuance of false and/or misleading statements, including the preparation of the

2   false and/or misleading press releases and SEC filings.

3       17.     Defendant Robert S. Picow ("Picow") is, and at all times relevant hereto was, a

4   director of InfoSonics. Because of Picow's position, he knew or should have known the adverse,

5   non-public information about the business of InfoSonics, specifically, the Company's improper

6   classification of warrants, as well as its finances, markets and present and future business prospects,

7   via access to internal corporate documents, conversations and connections with other corporate

8   officers and employees, attendance at Board meetings and committees thereof and via reports and

9   other information provided to him in connection therewith. During the Relevant Period, Picow

10  participated in the issuance of false and/or misleading statements, including the preparation of the

11  false and/or misleading press releases and SEC filings.

12      18.     Defendant Kirk A. Waldron ("Waldron") is, and at all times relevant hereto was, a

13  director of InfoSonics. Because of Waldron's position, he knew or should have known the adverse,

14  non-public information about the business of InfoSonics, specifically, the Company's improper

15  classification of warrants, as well as its finances, markets and present and future business prospects,

16  via access to internal corporate documents, conversations and connections with other corporate

17  officers and employees, attendance at Board and management meetings and committees thereof and

18  via reports and other information provided to him in connection therewith. During the Relevant

19  Period, Waldron participated in the issuance of false and/or misleading statements, including the

20  preparation of the false and/or misleading press releases and SEC filings.

21      19.     The defendants identified in ¶¶12, 15-18 are referred to herein as the "Director

22  Defendants."  The defendants identified in ¶¶12-15 are referred to herein as the "Officer

23  Defendants."  The defendants identified in ¶¶12-15 are referred to herein as the "Insider Selling

24  Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling

25  Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

27      20.     By reason of their positions as officers, directors and/or fiduciaries of InfoSonics and

28  because of their ability to control the business and corporate affairs of InfoSonics, the Individual

Defendants owed InfoSonics and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage InfoSonics in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of InfoSonics and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

21.     Each director and officer of the Company owes to InfoSonics and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

22.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of InfoSonics, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with InfoSonics, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of InfoSonics.

23.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of InfoSonics, and was at all times acting within the course and scope of such agency.

24.     To discharge their duties, the officers and directors of InfoSonics were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of InfoSonics were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements,

- 7 -

1  including acting only within the scope of its legal authority and disseminating truthful and accurate

2  statements to the SEC and the investing public;

3          (c)     conduct the affairs of the Company in an efficient, business like manner so as

4  to make it possible to provide the highest quality performance of its business, to avoid wasting the

5  Company's assets, and to maximize the value of the Company's stock;

6          (d)     properly and accurately guide investors and analysts as to the true financial

7  condition of the Company at any given time, including making accurate statements about the

8  Company's financial results and prospects, and ensuring that the Company maintained an adequate

9  system of financial controls such that the Company's financial reporting would be true and accurate

10  at all times;

11          (e)     remain informed as to how InfoSonics conducted its operations, and, upon

12  receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable

13  inquiry in connection therewith, and to take steps to correct such conditions or practices and make

14  such disclosures as necessary to comply with federal and state securities laws; and

15          (f)     ensure that the Company was operated in a diligent, honest and prudent

16  manner in compliance with all applicable federal, state and local laws, rules and regulations.

17          25.    Each Individual Defendant, by virtue of his or her position as a director and/or

18  officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and

19  the exercise of due care and diligence in the management and administration of the affairs of the

20  Company, as well as in the use and preservation of its property and assets.  The conduct of the

21  Individual Defendants complained of herein involves a knowing and culpable violation of their

22  obligations as directors and officers of InfoSonics, the absence of good faith on their part, and a

23  reckless disregard for their duties to the Company and its shareholders that the Individual

24  Defendants were aware or should have been aware posed a risk of serious injury to the Company.

25  The conduct of the Individual Defendants who were also officers and/or directors of the Company

26  during the Relevant Period has been ratified by the remaining Individual Defendants who

27  collectively comprised all of InfoSonics' Board during the Relevant Period.

28

26.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws.  As a result, InfoSonics has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel;

(b)     Costs incurred in investigating and defending InfoSonics and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment;

(c)     Additional costs in the form of increased directors' and officers' liability and fiduciary liability insurance premiums; and

(d)     Costs incurred from directing manpower to correct InfoSonics' defective internal controls and to restate its earnings for 1Q:06.

27.     Moreover, these actions have irreparably damaged InfoSonics' corporate image and goodwill.  For at least the foreseeable future, InfoSonics will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that InfoSonics' ability to raise equity capital or debt on favorable terms in the future is now impaired.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

28.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

29.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at InfoSonics and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of InfoSonics, regarding the Individual Defendants' management of InfoSonics' operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

30.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least January 2006 and continuing thereafter.  During this time the Individual Defendants caused the Company to conceal the true fact that InfoSonics was misrepresenting its financial results.   In addition, defendants also made other specific, false statements about InfoSonics' financial performance and future business prospects, as alleged herein.

31.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of InfoSonics common stock so they could dispose of over $2.6 million of their personally held stock and protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

32.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority

1  of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in

2  the conspiracy, common enterprise and/or common course of conduct complained of herein.

3      33.   Each of the Individual Defendants aided and abetted and rendered substantial

4  assistance in the wrongs complained of herein. In taking such actions to substantially assist the

5  commission of the wrongdoing complained of herein, each Individual Defendant acted with

6  knowledge of the primary wrongdoing, substantially assisted the accomplishment of that

7  wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

8                                    **BACKGROUND**

9      34.   Nominal defendant InfoSonics facilitates the delivery of wireless handsets from the

10  factory floor to the final consumer in the United States and throughout Latin America. The

11  Company distributes products of several key manufacturers, including i-mate, Motorola, Nokia,

12  Novatel, Samsung, VK Mobile and others. InfoSonics operates a warehouse and distribution center

13  in Miami, Florida, which services its customers in the United States and Latin America. The

14  Company's distribution and solution services include product testing, approval and certification, light

15  assembly, warehousing, logistics services (packing, shipping and delivery), marketing campaigns,

16  warranty services and end-user support. These services are provided for manufacturers of wireless

17  telecommunications products.

18                                **IMPROPER STATEMENTS**

19      35.   The Individual Defendants by their fiduciary duties of care, good faith and loyalty

20  owed to InfoSonics a duty to insure that the Company's financial reporting fairly presented, in all

21  material respects, the operations and financial condition of the Company. In order to adequately

22  carry out these duties, it is necessary for the Individual Defendants to know and understand the

23  material non-public information to be either disclosed or omitted from the Company's public

24  statements. This material non-public information included the inappropriate classification of

25  warrants and the overstatement of income. Furthermore, defendants Marx, Picow and Waldron, as

26  members of the Audit Committee, had a special duty to know and understand this material

27  information as set out in the Audit Committee's charter which provides that the Audit Committee is

28  responsible for reviewing and discussing with management the Company's quarterly financial

1    statements.  Defendants Ram, Rosler, Murgo and Klausner, as officers of InfoSonics, had ample

2    opportunity to discuss the classification of warrants with their fellow officers at management

3    meetings and via internal corporate documents and reports.  Moreover, defendants Marx, Ram,

4    Rosler, Picow and Waldron, as directors of InfoSonics had ample opportunity to discuss this material

5    information with management and fellow directors at any of the Board meetings that occurred during

6    the Relevant Period as well as at meetings of Committees of the Board.  Despite these duties, the

7    Individual Defendants negligently, recklessly, and/or intentionally caused or allowed, by their

8    actions or inactions, the following improper statements to be disseminated by InfoSonics to the

9    investing public and the Company's shareholders during the Relevant Period.

10           36.     On May 8, 2006, the Individual Defendants caused or allowed the Company to issue a

11   press release announcing its financial results for 1Q:06, the period ending March 31, 2006. The press

12   release reported a first quarter revenue increases of 125% to $54.1 million compared to 1Q:05.  The

13   press release was signed by defendant Klausner and stated in relevant part:

14           InfoSonics Corporation, one of the fastest growing distributors of wireless handsets
             in the United States and Latin America, today announced financial results for the first
15           quarter ended March 31, 2006.

16           Revenues for the first quarter of 2006 were $54.1 million, a 125% increase
             compared with $24.0 million reported for the first quarter a year ago. Units shipped
17           during the quarter increased by 253% year-over-year, offsetting a 33% decline in
             average selling price.

18

19           Excluding the non-cash items described below, net income for the first
             quarter of 2006 increased 163% to approximately $827,000, or $0.11 per diluted
20           share based on 7.7 million weighted-average shares outstanding, as compared with
             approximately $315,000, or $0.05 per diluted share based on 5.9 million weighted-
21           average shares outstanding in the same quarter a year ago. Reconciliation of the
             foregoing non-GAAP financial measures follows later in this press release.

22           *During the first quarter 2006, the Company had income from a non-cash
             change in fair value of derivative liability (for financing related warrants) of*
23           *$963,000 and non-cash expense related to stock-option compensation of $52,000.*
             *To comply with accounting rules for treatment of derivative liabilities (SFAS 133),*
24           *the Company will record a non-cash loss or gain each quarter, based on the*
             *calculated change in fair value of the warrants, which were issued in conjunction*
25           *with the Company's financing during the first quarter. In addition, the company*
             *will recognize non-cash compensation expense (SFAS 123R) each quarter for*
26           *outstanding stock options. These non-cash items have the potential to materially*
             *affect the Company's earnings per share, both positively and negatively, on a*
27           *quarterly basis.*

28           Operating income from continuing operations for the first quarter of 2006
             increased 92% to $1.1 million compared with $564,000 for the first quarter of 2005.

- 12 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

"The first quarter was a promising start for 2006, building on strong results in 2005," stated Joseph Ram, InfoSonics' President and Chief Executive Officer. "During the quarter we significantly strengthened our balance sheet to position us for continued growth by completing a $14.4 million equity private placement, a portion of which will be used for our new Mexico facility. Additionally, we further executed on our strategy of expanding our product offering, adding Alcatel as a new manufacturer to our line-up. We now have a full range of low, mid and high-end phones to offer our carrier customers. In April we announced several new phone models which we displayed at the recent CTIA show in Las Vegas, which were well received."

Mr. Ram continued, "During the first quarter, we prepared for the positive sales momentum we are experiencing in our overall business by adding personnel and a new facility in Mexico. We continue to focus on growing our sales and profits by expanding our presence in existing markets and through new opportunities in growing markets; both of which augment our business scope and market position."

Gross profit for the first quarter of 2006 was $4.2 million or 7.7% of revenues, a dollar increase of 96%, compared to $2.1 million, or 8.9% of revenues for the first quarter of 2005. The Company's gross margins vary from quarter-to-quarter depending on product and geographic mix. The dollar increase in gross profit is due to the 125% increase in sales. The decline in gross profit percentage in the first quarter is primarily attributable to a decrease in U.S. sales, as product availability was limited and new product introductions did not materialize as expected during the quarter. The products in the U.S. market have traditionally held higher gross margins than those in other regions in which the Company currently operates. The Company anticipates increased U.S. sales in the coming quarters and expects new product launches in the U.S., thereby improving the balance to its regional sales.

Operating expenses in the first quarter of 2006 declined as a percent of sales to 5.7% or $3.1 million, compared with $1.6 million, or 6.5% of sales for the first quarter of 2005. The decrease as a percent of revenue is primarily due to operating efficiencies realized during the quarter. Operating margins declined to 2.0% as compared to 2.3% a year ago due to product and geographic mix and the resulting reduced gross margins.

37.    As a result of this positive news, the value of InfoSonics began to climb. On May 8, 2006, InfoSonics' stock closed up $1.04 per share to close at $14.12 per share – a one day increase of 8%. Thereafter, the value of InfoSonics' common stock continued to increase substantially to a Relevant Period high of $33.53 on June 2, 2006.

38.    InfoSonics' financial results for 1Q:06, the period ending March 31, 2006 were repeated in the Company's Form 10-Q filed with the SEC on May 15, 2006. The Form 10-Q also contained certifications submitted pursuant to Sections 302 and 906 and of the Sarbanes-Oxley Act of 2002, which were signed by defendants Ram and Klausner. The certifications stated in relevant part:

1.    I have reviewed this Quarterly Report on Form 10-Q of InfoSonics Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

* * *

(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934  (15 U.S.C. 78m or 78o(d)); and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**THE TRUTH IS REVEALED**

39.    On June 12, 2006, the Individual Defendants caused or allowed the Company to issue a press release entitled "InfoSonics Reclassifies Warrants from Liability to Equity, Amends 2006 First Quarter 10-Q; Adjustment is Non-Cash Based and Does Not Affect Operating Income or Cash Flows." The press release stated in relevant part:

> InfoSonics Corporation, one of the fastest growing distributors of wireless handsets in the United States and Latin America, announced today that it filed an amended 10-Q for the quarter ended March 31, 2006 to include a restatement of certain non-cash items in the financial statements for the same period. This non-cash restatement does not affect the Company's operating income from continuing operations or its statement of cash flows. In addition, as described below, the proforma non-GAAP earnings per share remain unchanged at $0.11 for the quarter ended March 31, 2006.
>
> The non-cash adjustment is a result of warrants issued in conjunction with the Company's financing completed in January 2006. The warrants were originally classified as a derivative liability for the period of January 30, 2006 through the end of the first quarter, March 31, 2006 and accounted for under Financial Accounting Standards No. 133 (SFAS 133). However, upon further investigation and an extensive review of the available literature from the Financial Accounting Standards Board (FASB), the Emerging Issues Task Force (EITF) and the U.S. Securities and Exchange Commission (SEC) regarding the treatment of these warrants under EITF 00-19 and SFAS 133, *the Company determined the warrants should have been reclassified as equity at February 17, 2006, the date upon which the SEC declared effective the Company's registration statement on Form S-3 registering the shares underlying the warrants.* Previously the warrants had been marked to market and remained a liability at March 31, 2006 and would have remained as such on a going forward basis, impacting each quarter's results. After an extensive review and consultation with its independent registered public accountants and its audit committee, the Company determined to restate its historical financial statements for the quarter ended March 31, 2006. Additionally, the Company believes future operating results should not be affected by the reclassification of the warrants.
>
> "Looking ahead, we are pleased that our financial statements will not be affected on a quarterly basis by having to mark-to-market the derivative liability which has now been moved to equity," stated Jeff Klausner, InfoSonics' Chief Financial Officer.
>
> The Company voluntarily initiated the review of the classification of its warrants and has worked diligently with its independent registered public accounting firm to insure that the reclassification is in accordance with currently available guidance by the FASB, EITF and SEC. While the Company and its accountants believe that the reclassification is appropriate, they cannot assure that accounting standards bodies or regulatory agencies will provide contrary guidance in the future.

40.    In response to this announcement, InfoSonics' value fell $6.84 per share losing 28% of its value to close at $17.38 per share.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# THE RESTATEMENT

41.    On June 12, 2006, the Individual Defendants caused or allowed the Company to file a Form 10-Q/A with the SEC.  The Form 10-Q/A stated in relevant part:

**NOTE 13. Restatement**

The Company has reassessed its application of certain provisions of EITF 00-19, *Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock.  **Specifically, it recorded $564,000 of other income during the quarter ended March 31, 2006 related to a mark to market adjustment of certain warrants. Since these warrants became part of permanent equity on February 17, 2006, InfoSonics should have ceased applying the mark to market provisions of EITF 00-19, on that date. Accordingly, the net income for the quarter ended March 31, 2006 has been reduced by a non-cash amount of $564,000.***

The following tables set forth for the quarter ended March 31, 2006 the amounts of the restatement adjustments and reconciliation from previously reported amounts to restated amounts for the quarter.

**Balance Sheet:**

| | Three Months Ended March 31, 2006 (Unaudited) | | |
|---|---|---|---|
| | As Previously Reported | Effect of Restatement | Restated |
| Fair value of derivative liability | $  2,041,265 | $   (2,041,265) | $        — |
| Total liabilities | 39,622,123 | (2,041,265) | 37,580,858 |
| Additional paid-in capital | 24,152,706 | 2,605,607 | 26,758,313 |
| Retained earnings | 6,348,938 | (564,342) | 5,784,596 |
| Total stockholders equity | 30,508,410 | 2,041,265 | 32,549,675 |

**Statement of Operations**

| | Three Months Ended March 31, 2006 (Unaudited) | | |
|---|---|---|---|
| | As Previously Reported | Effect of Restatement | Restated |
| Other Income: change in fair value of derivative liability | $   963,351 | $  (564,342) | $  399,009 |
| Income from continuing operations before provision for income taxes | 1,966,551 | (564,342) | 1,402,209 |
| Income from Continuing operations | 1,739,513 | (564,342) | 1,175,171 |
| *Net income* | *1,737,669* | *(564,342)* | *1,173,327* |
| *Basic earnings per share* | *$      0.27* | *$    (0.09)* | *$    0.18* |
| *Diluted earnings per share* | *$      0.22* | *$    (0.07)* | *$    0.15* |

**Statement of Cash Flows**

| | Three Months Ended March 31, 2006 (Unaudited) | | |
|---|---|---|---|
| | As Previously Reported | Effect of Restatement | Restated |

- 16 -

| | | | |
|---|---|---|---|
| Net income from continuing operations | $ 1,739,513 | $ (564,342) | $ 1,175,171 |
| Change in fair value of derivative liability | (963,351) | 564,342 | (399,009) |
| Cash provided by (used in) continuing operations | (16,834,744) | — | (16,834,744) |

## REASONS THE STATEMENTS WERE IMPROPER

42.     During the Relevant Period, the Individual Defendants caused the Company to make false and misleading statements as the Individual Defendants caused the Company to fail to disclose that the Company: (a) had improperly classified warrants to liability; (b) lacked requisite internal controls, and was therefore unable to ascertain its true financial condition; and (c) that as a result of the forgoing, the value of the Company's net income and earnings where materially overstated at all relevant times.

43.     As a result of defendants' improprieties, InfoSonics has been forced to admit that it inappropriately classified warrants to liability and has restated its results to reclassify warrants to equity from liabilities.   As a result, InfoSonics' 1Q:06 financial statements were not a fair representation of its results and were presented in violation of GAAP and SEC rules.

44.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.   Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.   17 C.F.R. §210.10-01(a).

45.     In general, a company may enter into contracts that are indexed to and sometimes settled in its own stock.  A warrant to purchase shares of a company's stock is an example of such a contract.   Under EITF 00-19, *Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock*, a company will classify a contract for balance sheet purposes as an asset or liability or as equity at the inception date of the contract.   A company classifies the contract as an asset or liability if it requires a net-cash settlement.   A company classifies the contract as equity if it requires settlement in shares.  Contracts that include any

- 17 -

1   provisions that could require net-cash settlement must be accounted for as an asset or liability.

2   Thereafter, after the initial classification, a company must reassess the classification of a contract at

3   each balance sheet date.  If a company determines that the classification of a contract has changed

4   during the period, then it must account for the reclassification from the date the event occurred that

5   caused the change.  EITF 00-19, ¶¶7-13.

6       46.    Here, the Individual Defendants directed InfoSonics to fail to maintain the

7   classification of warrants it had issued as liabilities when GAAP required those warrants to be

8   classified as equity.  Specifically, in January 2006, in connection with a sale of its common stock,

9   InfoSonics issued warrants to purchase shares of the Company's stock.  Under the terms of the

10  security purchase agreement, the Company would be liable to the purchasers for liquidated damages

11  if it failed to have the registration statement declared effective by the SEC.  On February 17, 2006,

12  the Company's registration statement registering the shares underlying the warrants was declared

13  effective by the SEC.  Accordingly, the potential for the Company to pay liquidated damages was

14  extinguished at that time and the Company was required to reclassify the warrants as equity.

15      47.    As a result of the Individual Defendants' failure to cause or allow the Company to

16  reclassify these warrants, InfoSonics improperly booked a gain for the period from February 17,

17  2006 to March 31, 2006 related to an increase in the market value of the warrants.

18      48.    The Individual Defendants have caused InfoSonics to restate its 1Q:06 financial

19  statements due to this GAAP violation which is an admission that the Company overstated its

20  income for the period by $564,342 and its diluted EPS by $0.07 per share – an overstatement of 32%

21  as InfoSonics originally reported $1.7 million in income and $0.22 diluted EPS per share.

22      49.    The fact that InfoSonics has been forced to restate its 1Q:06 financial statements is

23  also an admission that the Company's previously issued financial statements can no longer be relied

24  upon and that the overstatement of income was material.  Pursuant to GAAP, as set forth in

25  Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by

26  InfoSonics was to correct for material errors in its previously issued financial statements.  See APB

27  No. 20, ¶¶7-13.  Moreover, FASB Statement of Financial Accounting Standard ("SFAS") No. 154,

28  *Accounting Changes and Error Corrections*, ¶25 states: "Any error in the financial statements of a

1  prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by

2  restating the prior-period financial statements." Thus, GAAP provides that financial statements

3  should be restated in order to correct an error in previously issued financial statements. InfoSonics'

4  restatement is due to an error.  Thus, the restatement is an admission by InfoSonics that its

5  previously issued financial results and its public statements regarding those results were false.

6      50.    Due to these accounting improprieties, the Individual Defendants caused the

7  Company to present its financial results and statements in a manner which violated GAAP, including

8  the following fundamental accounting principles:

9          (a)    The principle that interim financial reporting should be based upon the same

10  accounting principles and practices used to prepare annual financial statements was violated (APB

11  No. 28, ¶10);

12          (b)    The principle that financial reporting should provide information that is useful

13  to present and potential investors and creditors and other users in making rational investment, credit

14  and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

15          (c)    The principle that financial reporting should provide information about the

16  economic resources of an enterprise, the claims to those resources, and effects of transactions, events

17  and circumstances that change resources and claims to those resources was violated (FASB

18  Statement of Concepts No. 1, ¶40);

19          (d)    The principle that financial reporting should provide information about how

20  management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

21  for the use of enterprise resources entrusted to it was violated.  To the extent that management offers

22  securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

23  accountability to prospective investors and to the public in general (FASB Statement of Concepts

24  No. 1, ¶50);

25          (e)    The principle that financial reporting should provide information about an

26  enterprise's financial performance during a period was violated.  Investors and creditors often use

27  information about the past to help in assessing the prospects of an enterprise.  Thus, although

28  investment and credit decisions reflect investors' expectations about future enterprise performance,

1   those expectations are commonly based at least partly on evaluations of past enterprise performance

2   (FASB Statement of Concepts No. 1, ¶42);

3         (f)     The principle that financial reporting should be reliable in that it represents

4   what it purports to represent was violated.  That information should be reliable as well as relevant is

5   a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

6         (g)     The principle of completeness, which means that nothing is left out of the

7   information that may be necessary to insure that it validly represents underlying events and

8   conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

9         (h)     The principle that conservatism be used as a prudent reaction to uncertainty to

10   try to ensure that uncertainties and risks inherent in business situations are adequately considered

11   was violated.  The best way to avoid injury to investors is to try to ensure that what is reported

12   represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

13   **ILLEGAL INSIDER SELLING**

14       51.    As a result of the Individual Defendants' actions, InfoSonics' market capitalization has

15   been damaged by over $218 million.  At the same time that the defendants were causing InfoSonics

16   to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much

17   better by selling over $2.6 million of their personally held stock.

18       52.    While in possession of the undisclosed material adverse information, the Insider

19   Selling Defendants sold the following shares of InfoSonics stock:

| Name | Transaction Date(s) | Shares | Price | Proceeds |
|---|---|---|---|---|
| Jeffrey A. Klausner | 05/19/2006 | 1,000 | 19.75 | $19,750.00 |
| | 05/19/2006 | 1,175 | 19.55 | $22,971.25 |
| | 05/19/2006 | 300 | 19.51 | $5,853.00 |
| | 05/19/2006 | 7,700 | 19.5 | $150,150.00 |
| | 05/19/2006 | 125 | 19.1 | $2,387.50 |
| | 05/19/2006 | 1,200 | 18.89 | $22,668.00 |
| | 05/19/2006 | 200 | 18.85 | $3,770.00 |
| | 05/19/2006 | 1,000 | 18.61 | $18,610.00 |
| | 05/19/2006 | 300 | 18.55 | $5,565.00 |
| | 06/05/2006 | 500 | 29.86 | $14,930.00 |
| | 06/05/2006 | 400 | 29.79 | $11,916.00 |
| | 06/05/2006 | 100 | 29.69 | $2,969.00 |
| | 06/05/2006 | 400 | 29.59 | $11,836.00 |
| | 06/05/2006 | 400 | 29.5 | $11,800.00 |
| | 06/05/2006 | 1,200 | 29.42 | $35,304.00 |

| | | | | |
|---|---|---|---|---|
| | 06/05/2006 | 500 | 29.25 | $14,625.00 |
| | 06/05/2006 | 1,300 | 29.18 | $37,934.00 |
| | 06/05/2006 | 200 | 29.04 | $5,808.00 |
| | 06/05/2006 | 1,100 | 29.01 | $31,911.00 |
| | 06/05/2006 | 900 | 29 | $26,100.00 |
| | 06/05/2006 | 900 | 28.9 | $26,010.00 |
| | 06/05/2006 | 1,300 | 28.82 | $37,466.00 |
| | 06/05/2006 | 1,100 | 28.52 | $31,372.00 |
| | 06/05/2006 | 1,000 | 28.49 | $28,490.00 |
| | 06/05/2006 | 350 | 28.46 | $9,961.00 |
| | 06/05/2006 | 550 | 28.45 | $15,647.50 |
| | 06/05/2006 | 800 | 27.96 | $22,368.00 |
| | | **26,000** | | **$628,172.25** |
| | | | | |
| Joseph C. Murgo | 06/02/2006 | 500 | 32.02 | $16,010.00 |
| | 06/02/2006 | 400 | 32.01 | $12,804.00 |
| | 06/02/2006 | 200 | 33.22 | $6,644.00 |
| | 06/02/2006 | 200 | 33.21 | $6,642.00 |
| | 06/02/2006 | 23 | 33.2 | $763.60 |
| | 06/02/2006 | 300 | 33.09 | $9,927.00 |
| | 06/02/2006 | 100 | 33.07 | $3,307.00 |
| | 06/02/2006 | 1,100 | 33.06 | $36,366.00 |
| | 06/02/2006 | 2,777 | 33.05 | $91,779.85 |
| | 06/02/2006 | 200 | 33.02 | $6,604.00 |
| | 06/02/2006 | 1,500 | 33 | $49,500.00 |
| | 06/02/2006 | 500 | 32.85 | $16,425.00 |
| | 06/02/2006 | 800 | 32.8 | $26,240.00 |
| | 06/02/2006 | 1,100 | 32.74 | $36,014.00 |
| | 06/02/2006 | 1,300 | 32.71 | $42,523.00 |
| | 06/02/2006 | 400 | 32.69 | $13,076.00 |
| | 06/02/2006 | 100 | 32.65 | $3,265.00 |
| | 06/02/2006 | 200 | 32.62 | $6,524.00 |
| | 06/02/2006 | 100 | 32.61 | $3,261.00 |
| | 06/02/2006 | 2,200 | 32.6 | $71,720.00 |
| | 06/02/2006 | 400 | 32.56 | $13,024.00 |
| | 06/02/2006 | 400 | 32.55 | $13,020.00 |
| | 06/02/2006 | 2,000 | 32.5 | $65,000.00 |
| | 06/02/2006 | 100 | 32.4 | $3,240.00 |
| | 06/02/2006 | 600 | 32.39 | $19,434.00 |
| | 06/02/2006 | 200 | 32.29 | $6,458.00 |
| | 06/02/2006 | 200 | 32.27 | $6,454.00 |
| | 06/02/2006 | 900 | 32.26 | $29,034.00 |
| | 06/02/2006 | 600 | 32.25 | $19,350.00 |
| | 06/02/2006 | 500 | 32.07 | $16,035.00 |
| | 06/02/2006 | 100 | 32.05 | $3,205.00 |
| | 05/12/2006 | 15,000 | 18.2 | $273,000.00 |
| | 05/12/2006 | 1,300 | 18.05 | $23,465.00 |
| | 05/12/2006 | 100 | 18.02 | $1,802.00 |
| | 05/12/2006 | 1,000 | 18.01 | $18,010.00 |
| | 05/12/2006 | 17,100 | 18 | $307,800.00 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | 05/12/2006 | 500 | 17.96 | $8,980.00 |
|---|---|---|---|---|
| | | **55,000** | | **$1,286,706.45** |
| | | | | |
| Joseph Ram | 05/11/2006 | **25,000** | 17.15 | **$428,797.50** |
| | | **25,000** | | **$428,797.50** |
| | | | | |
| Abraham G. Rosler | 05/24/2006 | 100 | 19.91 | $1,991.00 |
| | 05/24/2006 | 160 | 19.64 | $3,142.40 |
| | 05/24/2006 | 200 | 19.63 | $3,926.00 |
| | 05/24/2006 | 400 | 19.54 | $7,816.00 |
| | 05/24/2006 | 100 | 19.39 | $1,939.00 |
| | 05/24/2006 | 200 | 19.28 | $3,856.00 |
| | 05/24/2006 | 250 | 19.27 | $4,817.50 |
| | 05/24/2006 | 440 | 19.26 | $8,474.40 |
| | 05/24/2006 | 650 | 19.25 | $12,512.50 |
| | 05/24/2006 | 110 | 21.2 | $2,332.00 |
| | 05/24/2006 | 700 | 21.02 | $14,714.00 |
| | 05/24/2006 | 2,000 | 21 | $42,000.00 |
| | 05/24/2006 | 800 | 20.94 | $16,752.00 |
| | 05/24/2006 | 900 | 20.9 | $18,810.00 |
| | 05/24/2006 | 100 | 20.79 | $2,079.00 |
| | 05/24/2006 | 200 | 20.78 | $4,156.00 |
| | 05/24/2006 | 600 | 20.75 | $12,450.00 |
| | 05/24/2006 | 100 | 20.74 | $2,074.00 |
| | 05/24/2006 | 100 | 20.72 | $2,072.00 |
| | 05/24/2006 | 1,100 | 20.69 | $22,759.00 |
| | 05/24/2006 | 300 | 20.67 | $6,201.00 |
| | 05/24/2006 | 400 | 20.65 | $8,260.00 |
| | 05/24/2006 | 100 | 20.64 | $2,064.00 |
| | 05/24/2006 | 100 | 20.6 | $2,060.00 |
| | 05/24/2006 | 900 | 20.58 | $18,522.00 |
| | 05/24/2006 | 300 | 20.57 | $6,171.00 |
| | 05/24/2006 | 100 | 20.55 | $2,055.00 |
| | 05/24/2006 | 400 | 20.51 | $8,204.00 |
| | 05/24/2006 | 800 | 20.46 | $16,368.00 |
| | 05/24/2006 | 289 | 20.4 | $5,895.60 |
| | 05/24/2006 | 500 | 20.36 | $10,180.00 |
| | 05/24/2006 | 200 | 20.35 | $4,070.00 |
| | 05/24/2006 | 100 | 20.26 | $2,026.00 |
| | 05/24/2006 | 100 | 20.25 | $2,025.00 |
| | 05/24/2006 | 900 | 20.2 | $18,180.00 |
| | 05/24/2006 | 200 | 20.15 | $4,030.00 |
| | 05/24/2006 | 101 | 20.01 | $2,021.01 |
| | | **15,000** | | **$307,005.41** |
| | | | | |
| Total | | **121,000** | | **$2,650,681.61** |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

53.     Plaintiff brings this action derivatively in the right and for the benefit of InfoSonics to redress injuries suffered, and to be suffered, by InfoSonics as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. InfoSonics is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

54.     Plaintiff will adequately and fairly represent the interests of InfoSonics in enforcing and prosecuting its rights.

55.     Plaintiff is and was an owner of the stock of InfoSonics during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

56.     The current Board of InfoSonics consists of the following five individuals: defendants Ram, Rosler, Marx, Picow and Waldron. Plaintiff has not made any demand on the present Board of InfoSonics to institute this action because such a demand would be a futile, wasteful and useless act.

57.     The Audit Committee was responsible under its charter for obtaining and reviewing reports concerning the treatment of InfoSonics' financial information and the ramification of the use of alternative treatments. Therefore, plaintiff alleges on information and belief that the Audit Committee obtained and reviewed reports concerning the accounting treatment of the warrants before InfoSonics issued its financial results for 1Q:06. The Audit Committee then decided to maintain the classification of the warrants as liability resulting in an overstatement of the Company's earnings for the quarter. The Audit Committee's egregious decision to maintain the warrants' classification as a liability was not the product of valid business judgment. According to InfoSonics' Proxy Statement filed with the SEC on or about April 4, 2006, defendants Marx, Picow and Waldron were members of the Audit Committee when this decision was made. Accordingly, defendants Marx, Picow and Waldron face liability for breaching their fiduciary duties to InfoSonics by participating in the decision to maintain the classification of the warrants. As a result of these defendants' breach of their duties, any demand upon them is futile.

58.     As a result of defendants Rosler and Ram's access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse, non-public information regarding the improper accounting.  Specifically, plaintiff on information and belief alleges that defendants Rosler and Ram as members of InfoSonics' management participated in the preparation of reports to the Audit Committee regarding the accounting treatment of the warrants.  Therefore, these defendants knew that InfoSonics was improperly classifying the warrants as debt.  Defendants Rosler and Ram while in possession of this material adverse, non-public, information participated in the illegal insider selling:

(a)     During the Relevant Period, Ram sold 25,000 shares of InfoSonics stock for proceeds of $428,797.50; and

(b)     During the Relevant Period, Rosler sold 15,000 shares of InfosSonics stock for proceeds of $307,005.41.  Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested.  Also, these defendants face liability for breach of their fiduciary duties for insider selling.  Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile.

59.     Defendant Ram dominates and controls each of the Individual Defendants on the Company's Board as he founded the Company and controls over 37% of the Company's outstanding common stock.  Ram has sole voting power over his stock holdings.  During the Relevant Period defendant Ram realized over $428,000 profit from the improper sale of his InfoSonics stock.  Further, defendant Ram holds and has held various executive positions within the Company including President, CEO and director.  Moreover, defendant Ram by his power and influence over InfoSonics controls the substantial compensation paid to the officers and directors who serve on the Board.  By virtue of defendant Ram's substantial stock holdings, his present and past positions within the Company, and his participation in the wrongdoing alleged herein, defendant Ram is not independent and is not disinterested and thus demand upon him would be futile.  Likewise, by virtue of this defendant's domination and control over the Company's Board, demand upon defendants Rosler, Marx, Picow and Waldron would be futile.

60.     Defendants Marx and Waldron, by their specialized financial expertise, were in a unique position to understand the business of InfoSonics, as well as its finances, markets and present and future business prospects.  Specifically, defendants Marx and Waldron were determined to be "audit committee experts" and to "have, through education and experience ... sufficient financial expertise in accounting and auditing, in accordance with such regulations as may be applicable to the Company from time to time."  These defendants because of their unique qualifications, had a heightened duty to insure the accuracy and fairness of InfoSonics' financials.  Nonetheless, defendants Marx and Waldron breached their duties by causing or allowing the improper financials described herein.  As a result of these defendants' breach of their duties, any demand upon them is futile.

61.     Defendants Marx, Pico and Waldron as non-employee directors receive $13,500 per year, payable quarterly. Defendant Marx as the Chairman of the Audit Committee receives an additional $2,000 per year, payable quarterly.  These defendants also received stock options to purchase 30,000 shares of InfoSonics' common stock at an exercise price based on the price of a share of Common Stock as reported on the New York Stock Exchange on the date of grant. Half of the 30,000 options granted defendants Marx, Pico and Waldron will expire in 2010 and the other half in 2008. The options were fully vested as of December 30, 2005 and are exercisable.  Accordingly, defendants Marx, Pico and Waldron are interested in maintaining their positions on the Board so as to safeguard their substantial compensation and stock options. Thus, demand upon these defendants is futile.

62.     The entire InfoSonics Board and senior management participated in the wrongs complained of herein.  InfoSonics' directors are not disinterested or independent due to the following: defendants Ram, Rosler, Marx, Picow and Waldron served on the InfoSonics Board during the Relevant Period.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs.  Each of the above referenced defendants breached the fiduciary duties that they owed to InfoSonics and its shareholders in that they failed to prevent and correct the improper financials. Thus, the InfoSonics Board cannot exercise independent objective judgment in deciding whether to bring this action or

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  whether to vigorously prosecute this action because its members are interested personally in the

2  outcome as it is their actions that have subjected InfoSonics to millions of dollars in liability for

3  possible violations of applicable securities laws.

4      63.    The Director Defendants of InfoSonics, as more fully detailed herein, participated in,

5  approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to

6  conceal or disguise those wrongs from InfoSonics' stockholders or recklessly and/or negligently

7  disregarded the wrongs complained of herein, and are therefore not disinterested parties.

8      64.    In order to bring this suit, all of the directors of InfoSonics would be forced to sue

9  themselves and persons with whom they have extensive business and personal entanglements, which

10 they will not do, thereby excusing demand.

11     65.    The acts complained of constitute violations of the fiduciary duties owed by

12 InfoSonics' officers and directors and these acts are incapable of ratification.

13     66.    Each of the Director Defendants of InfoSonics authorized and/or permitted the false

14 statements disseminated directly to the public or made directly to securities analysts and which were

15 made available and distributed to shareholders, authorized and/or permitted the issuance of various

16 of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged

17 herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by

18 them.

19     67.    Any suit by the current directors of InfoSonics to remedy these wrongs would likely

20 expose the Individual Defendants and InfoSonics to further violations of the securities laws that

21 would result in civil actions being filed against one or more of the Individual Defendants, thus, they

22 are hopelessly conflicted in making any supposedly independent determination whether to sue

23 themselves.

24     68.    InfoSonics has been and will continue to be exposed to significant losses due to the

25 wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed

26 any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt

27 to recover for InfoSonics any part of the damages InfoSonics suffered and will suffer thereby.

28

69.     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions.  This they will not do.  Thus, demand is futile.

70.     If InfoSonics' current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of InfoSonics.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by InfoSonics against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of InfoSonics, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause InfoSonics to sue them, since they will face a large uninsured liability.

71.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for InfoSonics for any of the wrongdoing alleged by plaintiff herein.

72.     Plaintiff has not made any demand on shareholders of InfoSonics to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     InfoSonics is a publicly held company with 13.5 million shares outstanding, and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against Defendants Ram and Klausner for Disgorgement Under the Sarbanes-Oxley Act of 2002

73.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

74.     Section 304 of the Sarbanes-Oxley Act of 2002 provides that if a public company prepares an accounting restatement due to material non-compliance with any financial reporting requirement under federal securities laws, and such non-compliance resulted from misconduct, then the company's chief executive officer and chief financial officer must reimburse the company for certain payments made by the company to those executives.  Section 304, entitled "Forfeiture of Certain Bonuses and Profits," provides in full:

a.     **Additional compensation prior to noncompliance with commission financial reporting requirements**.  If an issuer is required to prepare an accounting restatement due to the material non-compliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, *the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for* –

1.     any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and

2.     any profits realized from the sale of securities of the issuer during that 12-month period.

b.     **Commission exemption authority**.  The Commission may exempt any person from the application of subsection (a), as it deems necessary and appropriate.

75.     InfoSonics restated its financial statements for the first quarter of FY:06 due to the material non-compliance of such statements with federal securities laws reporting requirements. These restatements resulted from "misconduct" within the meaning of SOX §304.  The statement to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  require restatement during this period was the Form 10-Q filed on May 15, 2006, for the quarterly

2  period ending March 31, 2006. As a result, defendant Ram (as the Company's CEO from 1994 to

3  the present), and defendant Klausner (as the Company's CFO since July 2003 to the present), are

4  required to reimburse InfoSonics for all bonuses or other incentive-based or equity-based

5  compensation received by them from the Company during May 15, 2006 through and including May

6  15, 2007. Further, defendants Ram and Klausner also are liable to InfoSonics for any profits realized

7  from the sales of securities by the Company during that same period of time.

8      76.     Defendants Ram and Klausner are also liable to plaintiff for reasonable costs and

9  attorneys' fees in the prosecution of this derivative action on behalf of InfoSonics.

10                                        **COUNT II**

11  **Against the Director Defendants for Violation of Section 14(a) of the Exchange Act**

12      77.     Plaintiff incorporates by reference and realleges each and every allegation set forth

13  above, as though fully set forth herein.

14      78.     The Individual Defendants caused to be issued and participated in the issuance of

15  materially false and misleading written statements to shareholders which were contained in the

16  Company's proxy statement issued on April 28, 2006 ("2006 Proxy"). The 2006 Proxy falsely

17  represented and failed to disclose the Company's true financial prospects at the time. Specifically,

18  the 2006 Proxy failed to disclose that InfoSonics was improperly classifying warrants as debt and

19  that the Company lacked requisite internal controls to ascertain its financial condition. By reasons of

20  the improprieties alleged herein, defendants Ram, Rosler, Marx, Picow and Waldron who were

21  directors that caused or allowed the issuance of this proxy statement, violated §14(a) of the

22  Exchange Act. As a direct and proximate result of the Director Defendants' wrongful conduct,

23  InfoSonics misled and/or deceived its shareholders by falsely portraying the Company's true

24  financial condition.

25      79.     This information would have been material to InfoSonics' shareholders in determining

26  whether or not: (i) to approve the proposed 2006 Equity Incentive Plan for the Individual Defendants

27  contained in the 2006 Proxy and (ii) to reelect defendants Ram, Rosler, Marx, Picow and Waldron as

28  directors of the Company.

80.     Plaintiff, on behalf of InfoSonics, thereby seeks relief for damages inflicted upon the Company in connection with the improper approval of the 2006 Equity Incentive Plan and the reelection of the Director Defendants based upon the misleading and incomplete proxy materials. Plaintiff, on behalf of InfoSonics, also seek a disgorgement of the compensation paid to the Individual Defendants in connection with 2006 Equity Incentive Plan described in the 2006 Proxy.

## COUNT III

### Against the Insider Selling Defendants for Violation of
### California Corporations Code §25402

81.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

82.     At the time that the Insider Selling Defendants sold their InfoSonics common stock as set forth herein, by reason of their high executive and/or directorship positions with InfoSonics, the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of InfoSonics' improper accounting.

83.     At the time of such sales, that information was not generally available to the public or the securities markets.  Had such information been generally available, it would have significantly reduced the market price of InfoSonics shares at that time.

84.     The Insider Selling Defendants, and each of them, had actual knowledge of material, adverse, non-public information and thus sold their InfoSonics common stock in California in violation of California Corporations Code §25402.

85.     Pursuant to California Corporations Code §25502.5, the Insider Selling Defendants, and each of them, are liable to InfoSonics for damages in an amount up to three times the difference between the price at which InfoSonics common stock was sold by the defendants, and each of them, and the market value which that InfoSonics common stock would have had at the time of the sale if the information known to the defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

## COUNT IV

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

86.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

87.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold InfoSonics common stock on the basis of such information.

88.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold InfoSonics common stock.

89.     At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of InfoSonics common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

90.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT V

### Against All Defendants for Breach of Fiduciary Duty

91.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

92.     The Individual Defendants owed and owe InfoSonics fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe InfoSonics the highest obligation of good faith, fair dealing, loyalty and due care.

93.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

94.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

95.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, InfoSonics has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

96.     Plaintiff on behalf of InfoSonics has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Abuse of Control

97.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

98.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence InfoSonics, for which they are legally responsible.

99.     As a direct and proximate result of the Individual Defendants' abuse of control, InfoSonics has sustained significant damages.

100.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

101.    Plaintiff on behalf of InfoSonics has no adequate remedy at law.

## COUNT VII

### Against All Defendants for Gross Mismanagement

102.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of InfoSonics in a manner consistent with the operations of a publicly held corporation.

104. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, InfoSonics has sustained significant damages in excess of hundreds of millions of dollars.

105. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

106. Plaintiff on behalf of InfoSonics has no adequate remedy at law.

## COUNT VIII

### Against All Defendants for Waste of Corporate Assets

107. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108. As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused InfoSonics to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

109. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

110. Plaintiff on behalf of InfoSonics has no adequate remedy at law.

## COUNT IX

### Against All Defendants for Unjust Enrichment

111. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

112. By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of InfoSonics.

113. Plaintiff, as a shareholder and representative of InfoSonics, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Declaring that defendants Ram and Klausner are liable under the SOX §304 of the Sarbanes-Oxley Act of 2002 and requiring them to reimburse InfoSonics for all bonuses or their incentive-based or equity-based compensation received by them from May 15, 2006 through May 15, 2007.

C.      Declaring and decreeing that defendants Ram, Rosler, Marx, Picow and Waldron caused the Company to act in violation of §14(a) of the Exchange Act;

D.      Directing InfoSonics to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect InfoSonics and its shareholders from a repeat of the damaging events that occurred during the Relevant Period, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the companies' By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.      a proposal to strengthen the Boards' supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of InfoSonics to nominate at least three candidates for election to the Board;

3.      appropriately test and then strengthen the internal audit and control functions; and

4.      control and limit insider stock selling;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust

- 34 -

1 | on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to

2 | assure that plaintiff on behalf of InfoSonics has an effective remedy;

3 |      F.      Awarding to InfoSonics restitution from the defendants, and each of them, and

4 | ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

5 |      G.      Awarding to plaintiff the costs and disbursements of the action, including reasonable

6 | attorneys' fees, accountants' and experts' fees, costs, and expenses; and

7 |      H.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

9 |      Plaintiff demands a trial by jury.

10 | DATED: June 27, 2006                   ROBBINS UMEDA & FINK, LLP
                                            BRIAN J. ROBBINS
                                            STEVEN J. SIMERLEIN

                                            _____
                                              BRIAN J. ROBBINS

                                          610 West Ash Street, Suite 1800
                                          San Diego, CA 92101
                                          Telephone: 619/525-3990
                                          Facsimile: 619/525-3991

                                          Attorneys for Plaintiff

G:\Cases\Infosonic\Complaints\Derivative\Infosonicsv2.doc

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, BRIAN J. ROBBINS, hereby declare as follows:

1.      I am a member of the law firm of Robbins Umeda & Fink, LLP, counsel for plaintiff in the above entitled action.  I have read the foregoing complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 27th day of June, 2006, at San Diego, California

_____
BRIAN J. ROBBINS

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

Caridad Miller, Derivatively on Behalf of InfoSonics Corporation

**DEFENDANTS** Joseph Ram, Jeffrey A. Klausner, Abraham G. Rosler, Joseph C. Murgo, Randall P. Marx, Robert S. Picow, Kirk A. Waldron

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED Calaveras, CA
PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT San Diego, CA
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Brian J. Robbins, Robbins Umeda & Fink, LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101  Telephone No.:619/525-3990

ATTORNEYS (IF KNOWN)

'06 CV 1336    LAB BLM

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX**
(For Diversity Cases Only)   FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

28 U.S.C. 1331

Shareholder Derivative Action; Breach of Fiduciary Duty, Abuse of Control, Gross Mismanagement Waste of Corporate Assets, Unjust Enrichment and Violations of Sarbanes-Oxley Act of 2002 and Securities Exchange Act of 1934.

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury-Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| | ☐ 340 Marine | | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | **SOCIAL SECURITY** | |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities Exchange |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC |
| ☒ 160 Stockholders Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of State |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | |
| ☐ 290 All Other Real Property | | ☐ 555 Prisoner Conditions | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding   ☐ 2 Removal from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23

DEMAND $

Check YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**   JUDGE                    Docket Number

DATE June 27, 2006

SIGNATURE OF ATTORNEY OF RECORD

#126560    $350    Ko    6/27/06

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)