ROBBINS UMEDA & FINK LLP
BRIAN J. ROBBINS (190264)
STEVEN J. SIMERLEIN (156979)
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@ruflaw.com
ssimerlein@ruflaw.com

JOHNSON BOTTINI, LLP
FRANK J. JOHNSON (174882)
FRANCIS A. BOTTINI, JR. (175783)
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 230-1839
frankb@johnsonbottini.com

Co-Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE INFOSONICS CORPORATION DERIVATIVE LITIGATION | Lead Case No. 06-CV-1336 BTM (BLM) |
| | (Derivative Action) |
| This Document Relates To: ALL ACTIONS. | PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO MAKE A DEMAND ON THE BOARD OF DIRECTORS, LACK OF STANDING AND FAILURE TO STATE A CLAIM |
| | Judge: Honorable Barry Ted Moskowitz<br>Courtroom: 15<br>Hearing Date: April 27, 2007<br>Hearing Time: 11:00 a.m. |

## TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ..... ii

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 2

III. ARGUMENT ..... 5

- A. LEGAL STANDARDS ..... 5
  - 1. Legal Standard for Motion to Dismiss ..... 5
  - 2. Legal Standard for Demand Futility ..... 5
    - a. General Maryland demand futility standards ..... 5
    - b. Stock options backdated by a board majority and received and misreported by other directors demonstrates demand futility ..... 7
- B. Demand Was Futile on the Infosonics Board of Directors ..... 10
  - 1. The Board Received and Misreported Backdated Stock Options Approved by a Majority of Directors on the Compensation Committee ..... 10
  - 2. Marx, Picow and Waldron are not disinterested due to their breaches of fiduciary duties as Audit Committee members ..... 14
  - 3. Ram and Rosler are not independent or disinterested ..... 17
  - 4. The demand futility allegations must be construed together ..... 19

IV. PLAINTIFFS HAVE ALLEGED A VALID CLAIM FOR ILLEGAL INSIDER TRADING UNDER CALIFORNIA CORPORATIONS CODE § 25402 ..... 20

V. PLAINTIFFS HAVE STANDING TO ASSERT A CLAIM UNDER SECTION 304 OF THE SARBANES-OXLEY ACT ..... 22

- A. The Text and Statutory Framework of Section 304 Supports an Implied Private Right of Action ..... 22
- B. Relevant Legislative History Supports an Implied Right of Action ..... 24

VI. CONCLUSION ..... 25

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) .......... 8

*AT&T Corp. v. FCC*, 369 F.3d 554 (D.C. Cir. 2004) .......... 25

*Bates v. United Parcel Serv., Inc.*, 465 F.3d 1069 (9th Cir. 2006) .......... 24

*Bennett v. Damascus Comm. Bank*, No. 267722-V, 2006 WL 2458718 (Md. Cir. Court Apr. 6, 2006) .......... 7

*Broam v. Bogan*, 320 F.3d 1023 (9th Cir. 2003) .......... 5, 25

*Cal. Pub. Employees' Ret. Sys. v. Coulter*, No. 19191, 2002 WL 31888343 (Del. Ch. Dec. 18, 2002) .......... 10, 13, 19

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) .......... 24

*Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949) .......... 1

*Conley v. Gibson*, 355 U.S. 41 (1957) .......... 5

*Crowley Marine Servs., Inc. v. Maritrans Inc.*, 447 F.3d 719 (9th Cir. 2006) .......... 22

*Currier v. Potter*, 379 F.3d 716 (9th Cir. 2004) .......... 22

*Dollens v. Zionts*, No. 01 CO2826, 2002 WL 1632261 (N.D. Ill. July 22, 2002) .......... 20

*First Pac. Bancorp., Inc. v. Helfer*, 224 F.3d 1117 (9th Cir. 2000) .......... 22, 23

*Friese v. Super. Ct.*, 134 Cal. App. 4th 693 (2005), *cert. denied*, 127 S.Ct. 138 (2006) .......... 20, 21

*Grobow v. Perot*, 539 A.2d 180 (Del. 1988) *overruled on other grounds sub nom Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) .......... 10

*Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003) .......... 16, 18

*Haberman v. Murchison*,
331 F. Supp. 180 (S.D.N.Y. 1971)........................................................................ 12

*Halpern v. Armstrong*,
491 F. Supp. 365 (S.D.N.Y. 1980)........................................................................ 14

*Harris v. Carter*,
582 A.2d 222 (Del. Ch. 1990)............................................................................. 19

*Howard v.Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ............................................................................ 11

*I.N.S. v. Cardoza-Fonseca*,
480 U.S. 421 (1987).......................................................................................... 24

*In re Cardinal Health Inc. Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) ............................................................... 19

*In re Cendant Corp. Derivative Action Litig.*,
189 F.R.D. 117 (D.N.J. 1999)...................................................................... 14, 17

*In re Emerging Commc'ns, Inc. S'holders Litig.*,
No. 16415, 2004 WL 1305745 (Del. Ch. May 3, 2004).......................................... 15

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005)................................................................. 19

*In re Linear Tech. Corp. Derivative Litig.*,
No. C-06-3290, 2006 WL 3533024 (N.D. Cal. Dec. 7, 2006)................................. 13

*In re Livent Noteholders Sec. Litig.*,
151 F. Supp. 2d 371 (S.D.N.Y. 2001)................................................................. 15

*In re Netflix, Inc. Sec. Litig.*,
No. C04-2978 FMS, 2005 WL 1562858 (N.D. Cal. Jun. 28, 2005)......................... 18

*In re Nuveen Fund Litig.*,
No. 94C360, 1996 WL 328001 (N.D. Ill. June 11, 1996) .................................. 10, 14

*In re Phillip Servs. Corp. Sec. Litig.*,
383 F. Supp. 2d 463 (S.D.N.Y. 2004)................................................................. 15

*In re Sagent Tech., Inc. Derivative Litig.*,
278 F. Supp. 2d 1079 (N.D. Cal. 2003) ............................................................... 21

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) .............................................................................. 12

*In re Tyson Foods, Inc.*,
No. 1106-N, 2007 WL 416132 (Del. Ch. Feb. 6, 2007) ..................................... 13, 16

*In re Veeco Instruments, Inc. Sec. Litig.*,
434 F. Supp. 2d 267 (S.D.N.Y. 2006)................................................................. 17

*Int'l Equity Capital Growth Fund, L.P. v. Clegg*,
1997 WL 208955 (Del. Ch. 1997) ........ 19

*Jolly Roger Fund LP v. Sizeler Property Investors, Inc.*,
No. Civ. RDB 05-841, 2005 WL 2989343 (D. Md. Nov. 3, 2005) ........ 7

*Kamen v. Kemper Fin. Servs. Inc.*,
500 U.S. 90 (1991) ........ 1, 5, 24

*Kashani v. Tsann Kuen China Ent. Co.*,
118 Cal. App. 4th 531 (2004) ........ 10

*Kogan v. Robinson*,
432 F. Supp. 2d 1075 (S.D. Cal. 2006) ........ 22, 23

*Kohls v. Duthie*,
791 A.2d 772 (Del. Ch. 2000) ........ 20

*Lewis v. Curtis*,
671 F.2d 779 (3d Cir. 1982) ........ 8, 20

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005) ........ 5

*Mitzner v. Hastings*,
No. C-04-3310, 2005 WL 88966 (N.D. Cal. Jan. 14, 2005) ........ 17

*Mizel v. Connelly*,
No. 16638, 1999 WL 550369 (Del. Ch. July 22, 1999) ........ 17

*Neer v. Pelino*,
389 F. Supp. 2d 648 (E.D. Pa. 2005) ........ 24

*Pearce v. Super. Ct.*,
149 Cal. App. 3d 1058 (1983) ........ 1

*Rales v. Blaseband*,
634 A.2d 927 (Del. 1993) ........ 8

*Ryan v. Gifford*,
No. CIV.A. 2213-N, 2007 WL 416162 (Del. Ch. Feb. 6, 2007) ........ *passim*

*Sanders v. Wang*,
No. 16640, 1999 WL 1044880 (Del. Ch. Nov. 8, 1999) ........ 13

*Schwier v. Cox*,
340 F.3d 1284 (11th Cir. 2003) ........ 23

*Seinfeld v. Barrett*,
No. 05-298, 2006 WL 890909 (D. Del. Mar. 31, 2006) ........ 17

*Strougo v. Carroll*,
No. 8040, 1991 WL 9978 (Del. Ch. Jan. 29, 1991) ........ 18

*Surowitz v. Hilton Hotels Corp.*,
383 U.S. 363 (1966) ........ 1

*Transamerica Mortgage Advisors, Inc. v. Lewis*,
444 U.S. 11 (1979) ........ 25

*U.S. ex rel. Lee v. SmithKline Beecham, Inc.*,
245 F.3d 1048 (9th Cir. 2001) ........ 25

*Warshaw v. Xoma Corp.*,
74 F.3d 955 (9th Cir. 1996) ........ 5

*Werbowsky v. Collomb*,
362 Md. 581 (2001) ........ *passim*

**STATUTES**

15 U.S.C.
§7242(a) ........ 23
§7242(b) ........ 23
§7243 ........ 22
§ 7244(a)(1), (a)(2)(A) ........ 23
§ 7244(a)(2)(B) ........ 23

17 C.F.R.
§ 240.16-a3(g)(1) ........ 11

Cal. Civ. Code
§1441 ........ 10

Fed. R. Civ. Proc.
15(a) ........ 25

**OTHER AUTHORITIES**

H.R. Rep. No. 1383,
73rd Cong., 2nd Sess., p. 13 (1934) ........ 12

## I. INTRODUCTION

Infosonics' "fundamental precept of corporate governance" carries an important corollary: while a corporate board of directors manages its company's affairs, that power is not unfettered. Where, as here, a board could not have objectively considered a demand to investigate and remedy improper stock option practices, intentionally mischaracterized stock warrants and illegal insider selling, as well as to take action against the responsible parties, a prior demand on that board is deemed unnecessary as a futile and wasteful act. The derivative actions consolidated in this Court thus represent a "remedy born of stockholder helplessness" that seek to protect Infosonics "from the misfeasance and malfeasance of 'faithless directors and managers.'"[1]

This litigation arises out of the individual defendants' intentionally-wrongful manipulation of Infosonics equities – specifically, stock options awarded to defendants carrying a manipulated grant date of December 30, 2005, and certain stock warrants issued by the Company in January 2006 that defendants misclassified as a liability instead of equity. Having established their illicit foundation of backdated options and misclassified warrants, the individual defendants then improperly sold over $2.9 million of their personally-held stock. Shortly afterward, an amended Infosonics financial statement on Form 10-Q/A disclosed, for the first time, that the warrants had been misclassified and that the Company was reducing its reported net income for the quarter ended March 31, 2006 by $564,000. The value of Infosonics stock then plummeted by over $218 million. The Company also faces further harm from the unreported compensation expense associated with the backdated stock options: another restatement, negative tax consequences, government investigations and prosecutions, civil penalties, and the intangible, long-term harm to its reputation. Despite these looming issues, the Company has yet to publicly disclose any investigation of the backdating.

[1] *Cohen v. Beneficial Indus. Loan Corp*., 337 U.S. 541, 548 (1949); *Kamen v. Kemper Fin. Servs. Inc*., 500 U.S. 90, 95 (1991). *See also Surowitz v. Hilton Hotels Corp*., 383 U.S. 363, 371 (1966) ("derivative suits have played a rather important role in protecting shareholders of corporations from the designing schemes and wiles of insiders"); *Pearce v. Super. Ct*., 149 Cal. App. 3d 1058, 1065 (1983) ("Great evils ... will result if undue obstacles are placed in the path of a shareholder who has legitimate grounds for suing. The derivative action is practically the only remedy for calling the management to account for its wrongs against the corporation and to obtain restitution.")

## II. FACTUAL BACKGROUND

- ***The wrongful, intentional backdating of Infosonics stock option grants***. "Backdating" refers to actions taken by a company official(s) to retroactively set the exercise price for a stock option based on a date other than the actual grant date of the option. ¶11. If the exercise price is set to a day on which the value of a Company's stock was lower than the price on the day the option actually was granted, the recipient pays less and the company receives less consideration when the option is exercised. *Id*. The Delaware Chancery Court recently defined backdating:

> Commonly known as backdating, this practice involves a company issuing stock options to an executive on one date while providing fraudulent documentation asserting that the options were actually issued earlier. These options may provide a windfall for executives because the falsely dated stock option grants often coincide with market lows. Such timing reduces the strike prices and inflates the value of stock options, thereby increasing management compensation. This practice allegedly violates any stock option plan that requires strike prices to be no less than the fair market value on the date on which the option is granted by the board. Further, this practice runs afoul of many state and federal common and statutory laws that prohibit the dissemination of false and misleading information.

*Ryan v. Gifford*, No. CIV.A. 2213-N, 2007 WL 416162 (Del. Ch. Feb. 6, 2007).

Here, plaintiffs Caridad Miller, Jason Haggerty and Peter J. Cunningham ("Plaintiffs") allege that in a proxy statement filed with the SEC on July 8, 2005, the Company proposed to amend its 2003 stock option plan, and described how options were to be priced: "The Plan provides that the exercise price of incentive options granted cannot be less than the fair market value of the underlying common stock on the date the incentive options are granted." ¶¶24, 70. Empirical analysis, however, of stock options purportedly granted on December 30, 2005 (the "Options") revealed this statement to be false and that the Options violated the terms of the Company's option plan. ¶26.

Specifically, the Options have an exercise price that represents the lowest point in the value of the Company's shares from December 27, 2005 to January 20, 2006, when the price dropped to $15.44. *Id*. The Options purportedly were granted just before a 43 percent increase in the price of the Company's shares between the date of the grant and January 13, 2007 – a zenith in value for the shares until over four months later on May 26, 2006, when the price closed at $24.90.[2] *See* Def.'s

---

[2] Defendants complain that "Plaintiffs do not explain (nor could they) why, if Defendants were disposed to 'collude' to backdate, they did not choose dates just ten days earlier when Infosonics

Ex. F at 106. Plaintiffs allege that such circumstances reasonably support the inference that the purported grant date for the Options is false, and that the Compensation Committee (which administered Infosonics' stock options) chose the date to bring an instant, hidden paper gain to the recipients because the Options were priced below the stock's fair market value when they were actually awarded. ¶¶26, 59. Under Generally Accepted Accounting Principles ("GAAP"), this gain amounted to the equivalent of paying extra compensation to the recipients, and thus represented an unrecorded cost to Infosonics. ¶60. As a result, its profits were overstated, and the Company faces severe tax consequences and SEC investigation. ¶¶61-64.

- ***The misclassification of warrants by the individual defendants***. Less than two weeks after tardily reporting their backdated options, on January 30, 2006, defendants caused Infosonics to announce that it had entered into agreements with institutional investors for a private placement of 1.1 million shares valued at $14.4 million. ¶¶27, 66. These investors also received warrants to purchase an additional 330,000 shares of Company stock at a purchase price of $18.38 per share. ¶66. The events were critical to the Company's business and increased shareholder equity by more than 80 percent. ¶67. Under the terms of the security purchase agreement for the warrants, the Company would be liable to the investors for liquidated damages if the SEC did not declare the registration statement for the warrants effective. ¶¶28, 82. Accordingly, the Company was required to, and did, classify these warrants as debt under applicable accounting guidelines. ¶¶28, 78. On February 17, 2006, the SEC declared the registration statement to be effective, which extinguished the Company's exposure to liquidated damages and required defendants to immediately reclassify the warrants as equity. ¶82. Defendants, however, directed Infosonics to continue to classify the warrants as debt. ¶82. As a result, the Company improperly booked a gain from the period February 17 to March 31, 2006 related to an increase in the market value of the warrants. ¶83.

- ***The misleading public statements and insider selling***. In March-April 2006, defendants caused Infosonics to publish false statements in the Company's Form 10-K for fiscal year 2005 and its proxy statement that the exercise price of the Options was not less than the fair market value of

---

stock traded as much as 16% lower." Defs.' Mem. at 12 n.8. But this is a question of fact wholly inappropriate for resolution at the pleadings stage.

the Company's stock on the date of the grant. ¶¶69-70. On May 8, 2006, the defendants caused Infosonics to publish a press release that continued the inaccurate characterization of the warrants. ¶71. It noted that the "[d]uring the first quarter 2006, the Company had income from a non-cash change in fair value of derivative liability (for financing related warrants) of $963,000 .... To comply with accounting rules for treatment of derivative liabilities (SFAS 133), the Company will record a non-cash loss or gain each quarter, based on the calculated charge in fair value of the warrants, which were issued in conjunction with the Company's financing during the first quarter." ¶71. The true impact of the misclassified warrants also was minimized via comments by Joseph Ram, Infosonics' CEO, on the Company's prospects in Mexico. ¶71. The Company's Form 10-Q for the first quarter of fiscal year 2006 continued the misclassification of the warrants and inaccurately-stated financial results. ¶73. This positive news caused Infosonics' stock to increase, reaching a relevant period high of $33.53 on June 2, 2006. ¶72. From May 8-June 12, 2006, certain defendants sold substantial amounts of their personally-held stock. ¶98; *see infra* at 18-19.

- ***News of the misclassified warrants and restatement devastates Infosonics stock price***.

A June 12, 2006 press release heralded the imminent restatement. ¶74. The press release noted that the warrants had been classified as a derivative liability for the first quarter of fiscal year 2006, but that "the Company determined the warrants should have been reclassified as equity at February 17, 2006, the date upon which the SEC declared effective the Company's registration statement on Form S-3 registering the shares underlying the warrants." ¶74. As a result of this error, the Company restated its financial information for the first quarter of fiscal year 2006 in Form 10-Q/A, also filed on June 12. ¶76. The restatement led to a $564,000 reduction in reported net income. ¶76. The reduction was required because as a result of the misclassified warrants, Infosonics improperly booked a gain for the period from February 17 to March 31, 2006 related to an increase in the market value of the warrants. ¶83. The restatement is an admission that the Company materially overstated its income by $564,342 and diluted earnings per share by $0.07, and that its previous financial statement cannot be relied upon. ¶¶84-85. In response to the news of the restatement, the value of Infosonics' stock fell $6.84 per share, losing 28 percent of its value. ¶75.

## III. ARGUMENT

### A. LEGAL STANDARDS

#### 1. Legal Standard for Motion to Dismiss

"Rule 12(b)(6) motions are viewed with disfavor." *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003).[3] Dismissal under this rule "is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim entitling plaintiff to relief." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940 (9th Cir. 2005). *See also Conley v. Gibson*, 355 U.S. 41, 47 (1957) (same). In evaluating such a motion, this Court must "take as true all allegations of material fact stated in the complaint and construe them in a light most favorable to the nonmoving party." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 957 (9th Cir. 1996); *see also Broam*, 320 F.3d at 1028 (court also must accept as true all "reasonable inferences to be drawn" from the alleged material facts). Here, the complaint clearly satisfies these standards.

#### 2. Legal Standard for Demand Futility

Because Infosonics is a Maryland corporation, the demand futility laws of that state apply to this Court's analysis. *See Kamen*, 500 U.S. at 108-09 (demand futility governed by law of nominal defendant's state of incorporation). Defendants imply that derivative actions based on demand futility have become passé in this state and face legislative extinction. *See* Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss for Failure to Make a Demand, etc. (Defs.' Mem.) at 8-9, citing *Werbowsky v. Collomb*, 362 Md. 581, 603 (2001). But defendants cite nothing to indicate that the Maryland legislature has eliminated such actions, which have been an important tool available to shareholders in this state since at least 1881. And in a derivative action alleging improper stock option backdating, the concept of demand futility remains especially vital.

##### a. General Maryland demand futility standards

In *Werbowsky*, Maryland's high court revisited over 100 years of its demand futility jurisprudence in the context of a shareholder derivative action that focused on the alleged domination and control of a Maryland corporate nominal defendant by a French corporation that was

[3] Here, as throughout, all citations are deemed omitted and all emphasis is deemed added unless otherwise stated.

the largest shareholder. The derivative claims arose out of a transaction between these two companies in which certain assets of the French entity were sold to the nominal defendant for an amount exceeding their worth by $190 million. 362 Md. at 585. The plaintiff had alleged that demand was futile as to a majority of a 16-member board of directors – six of whom the parties agreed were not independent as "inside" directors, and three of whom were "outside" directors not conflicted or controlled by the French corporation. *Id.* The court focused on the demand futility allegations for the remaining seven directors, which centered on alleged domination and control by the French company over the Maryland corporation's board. 362 Md. at 587-92.

In evaluating these allegations, *Werbowsky* did not rewrite Maryland demand futility jurisprudence, but merely noted that the then-extant *legislative* "trend" was to tighten the circumstances under which a shareholder plaintiff could allege facts to excuse demand. *Id*. at 607. The court thus held that a shareholder may allege demand futility if "the allegations or evidence clearly demonstrate, in a very particular manner," either of the following circumstances: "(1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." *Id*. at 620.

As much as defendants wish that it is impossible to adequately plead demand futility under this standard, that is simply not the case. For example, one federal district court found that a shareholder plaintiff adequately alleged demand futility under *Werbowsky* even though he did "generally allege that Defendants approved or participated in the alleged wrongs; ..." *Felker v. Anderson*, No. 04-0372-CV-W-ODS, 2005 WL 602974, at *3 (W.D. Mo. Feb. 11, 2005). In denying the motion to dismiss, the *Felker* court stated as follows:

> Plaintiff also *particularly* alleges, among other things, that Defendants permitted and/or approved of the dissemination of false or misleading press releases, they violated state law and fiduciary duties owed to Novastar, they have not sought to recover any part of the damages suffered by Novastar, and they concealed information from the public. Thus, Plaintiff has met the particularity requirement of Rule 23.1 and has properly pled why a pre-suit demand would have been futile.

*Id*. (original italics). Similarly, Plaintiffs here allege far more than the sort of "domination and

control" and other generalized allegations rejected by *Werbowsky* as insufficient. Plaintiffs offer many of the same kinds of allegations upheld in *Felker* as adequate, and also far more: that defendants schemed to backdate, conceal and misreport stock options.

**b. Stock options backdated by a board majority and received and misreported by other directors demonstrates demand futility**

Plaintiffs have located no Maryland authority, and defendants have cited none, that evaluate demand futility allegations in the context of a derivative action that arises out of illegal stock option backdating by the defendants. When Maryland courts face novel issues of corporate governance, they often turn to Delaware law for guidance.[4]

Derivative actions involving backdated stock options have generated few published decisions to date. A detailed analysis of this issue recently emerged from the Delaware Chancery Court in the *Ryan* decision, 2007 WL 416162. In *Ryan*, a shareholder of nominal defendant Maxim Integrated Products, Inc., filed a derivative action against Maxim's directors. He alleged that various option grants to the chairman and chief executive officer were backdated; *i.e.* they "were dated on unusually low (if not the lowest) trading days of the years in question, or on days immediately before sharp increases in the market price of the company." *Id.* at *2. Specifically, plaintiff alleged that under the relevant stock option plan, the Maxim board of directors designated a compensation committee of three directors that approved most of the backdated grants. *Id.* at *3. Plaintiff contended that demand was futile, but defendants countered that plaintiff had failed to allege sufficient particularized facts to show that the directors faced a substantial likelihood of personal liability, or to show that the majority of the board was not independent and disinterested. *Id.* at *7.

In a detailed analysis, the *Ryan* court first analyzed whether the plaintiff challenged a board decision or faulted it for non-action – a distinction with a difference. If a board decision is being challenged, a "[f]ailure to make demand may be excused if a plaintiff can raise a reason to doubt

[4] *See, e.g.*, *Bennett v. Damascus Comm. Bank*, No. 267722-V, 2006 WL 2458718 (Md. Cir. Court Apr. 6, 2006) (noting that "Maryland would follow Delaware's rule that the making of a demand 'moots' the futility exception"); *Jolly Roger Fund LP v. Sizeler Property Investors, Inc.*, No. Civ. RDB 05-841, 2005 WL 2989343 (D. Md. Nov. 3, 2005) ("With respect to corporate governance issues, Maryland courts often look to Delaware caselaw," and a court's analysis "will make reference to Delaware law in the absence of applicable Maryland law."). Based on the prevalence of Delaware law in defendants' brief, it appears that they would agree.

that: (1) a majority of the board is disinterested or independent or (2) the challenged acts were the product of the board's valid exercise of business judgment." *Ryan*, 2007 WL 416162, at *7, citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).[5] In the case of board inaction, the allegations "must 'create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.'" *Id.*, quoting *Rales v. Blaseband*, 634 A.2d 927, 933-34 (Del. 1993).

In *Ryan*, Chancellor Chandler noted that because the compensation committee of Maxim's board of directors approved the challenged grants and constituted a majority of the board, the *Aronson* test applied, as the committee's decision could be imputed to the board itself. *Id.* at *8. The chancellor found that the "unusual facts alleged raised a reason to doubt that the challenged transactions resulted from a valid exercise of business judgment." *Ryan*, 2007 WL 416162, at * 9. The court noted that "[t]he board had no discretion to contravene the terms of the stock option plans," which allegedly *required* that the exercise price of each option shall be not less than one hundred percent (100%) of the fair market value of the stock subject to the option on the date the option is granted." *Id.* (internal quotes and brackets omitted, original italics). The court also noted the advantageous timing of the options, which by the chancellor's "judgment and by support of empirical data, seems too fortuitous to be mere coincidence." *Id.* Observing that "[g]iven the choice between improbable good fortune and knowing manipulation of option grants, the Court may reasonably infer the latter, even when applying the heightened pleading standards of Rule 23.1." *Id.* Finding that demand was futile under *Aronson*, the chancellor held:

> Plaintiff here points to specific grants, specific language in option plans, specific public disclosures, and supporting empirical analysis to allege knowing and purposeful violations of shareholder plans and intentionally fraudulent public disclosures. Such facts, in my opinion, provide sufficient particularity in the pleading to survive a motion to dismiss for failure to make a demand ....

*Id.* *Ryan* also held that demand was excused under *Rales*:

---

[5] Echoing the perspective of Maryland's high court, Chancellor Chandler noted that "[c]reating such a reason to doubt is a difficult feat under Delaware law" that requires a plaintiff to "comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings ...." *Ryan*, 2007 WL 416162, at *7 n.23.

> A director who approves the backdating of options faces at the very *least* a substantial likelihood of liability, if only because it is difficult to conceive of a context in which a director may simultaneously lie to his shareholders (regarding his violations of a shareholder-approved plan, no less) and yet satisfy his duty of loyalty. Backdating options qualifies as one of those "rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." Plaintiff alleges that three members of a board *approved* backdated options, and another board member accepted them. These are sufficient allegations to raise a reason to doubt the disinterestedness of the current board and to suggest that they are incapable of impartially consider demand.

*Id.* (original brackets and italics).

Defendants may quibble that *Ryan* does not pass muster under W*erbowsky*, but such criticism would be misplaced. The latter purported to account for "some of the criticism" made by commentators of Delaware's test, including a speculative, perhaps insulting assertion by the American Law Institute ("ALI") that "a number of Federal cases applying Delaware law had found a reasonable doubt about the board's performance that might not have sufficed in Delaware." *Id.* at 613, 618. Thus, *Werbowsky* faulted decisions excusing demand "simply because a majority of the directors approved or participated in some way in the challenged transaction or decision, or on the basis of generalized or speculative allegations that they are conflicted or are controlled by other conflicted persons, or because they are paid well for their services as directors, were chosen as directors at the behest of controlling stockholders, or would be hostile to the action." *Id.* at 618.

None of these concerns implicate *Ryan* or undermine its applicability here. Chancellor Chandler was quite aware that his analysis of Delaware law in the context of a derivative suit based on allegations of stock option backdating – a case of first impression in that state's courts – would affect other parties to civil (and criminal) proceedings around the United States. *Ryan*, 2007 WL 416162, at *5. The chancellor specifically intended that his decision "remove doubt regarding Delaware law and avoid" exactly what the ALI had criticized: "inconsistencies that might arise in the event other state or federal courts, in applying Delaware law, reach differing conclusions." *Id.* The chancellor's analysis specifically rested on *Aronson* – a test lauded by the Maryland high court. *See Werbowsky*, 362 Md. at 610 ("As applied by the Delaware courts," the *Aronson* "formulation is an exacting requirement.").Thus, if a backdating derivative case alleging demand futility with facts parallel to *Ryan* were to be filed in a Maryland court, that court likely would apply the chancellor's

analysis and find that it conforms to the guidance expressed in *Werbowsky*, 326 Md. at 620.

## B. Demand Was Futile on the Infosonics Board of Directors

### 1. The Board Received and Misreported Backdated Stock Options Approved by a Majority of Directors on the Compensation Committee

*Werbowsky's* reading of demand futility jurisprudence is to maximize the protective effect of the business judgment rule. The backdating of stock options by the Infosonics board of directors (the "Board") is the type of activity that courts have recognized as demonstrating demand futility.[6]

Stock option backdating "cannot meet the test of business judgment" and the "intentional violation of a shareholder approved stock option plan, coupled with fraudulent disclosures regarding the directors' purported compliance with that plan, constitute conduct that is disloyal to the corporation and is therefore an act in bad faith." *Ryan*, 2007 WL 416162, at *9, *11.[7] Indeed, as *Ryan* opined:

> I am unable to fathom a situation where the deliberate violation of a shareholder approved stock option plan and false disclosures, obviously intended to mislead shareholders into thinking that the directors complied honestly with the shareholder-approved option plan, is anything but an act of bad faith. It certainly cannot be said to amount to faithful and devoted conduct of a loyal fiduciary. Well-pleaded allegations of such conduct are sufficient, in my opinion, to rebut the business judgment rule and to survive a motion to dismiss.

*Id.*, at *12.[8] In evaluating demand futility, the totality of the allegations need only support a reasonable doubt of business judgment protection, ***not a "judicial finding that the directors' actions are not protected by the business judgment rule***." *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988) *overruled on other grounds sub nom Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

Here, the complaint offers well-pleaded allegations that support a reasonable doubt that

---

[6] *See, e.g. In re Broadcom Corp. Derivative Litig.*, Case No. 2:06-cv-03252-R-CWX, Order Denying Broadcom Corporation's Motion to Dismiss Plaintiffs' Consolidated Amended Derivative Complaint, (C.D. Cal. filed Mar. 9, 2007) (Simerlein Decl. Ex. A).

[7] *See also Cal. Pub. Employees' Ret. Sys. v. Coulter*, No. 19191, 2002 WL 31888343, at *11 (Del. Ch. Dec. 18, 2002) (board action "that falls outside the rather broad scope of its authority is not entitled to the protection of the business judgment rule."); *In re Nuveen Fund Litig.*, No. 94C360, 1996 WL 328001, at *5 (N.D. Ill. June 11, 1996) ("Transactions beyond the powers explicitly conferred by the articles of incorporation do not constitute an exercise of valid business judgment.").

[8] Indeed, it is impossible to imagine how the Board's *ultra vires* actions that resulted in the issuance of void stock options constituted a proper exercise of business judgment. *See, e.g.*, Cal. Civ. Code §1441 ("A condition in a contract, the fulfillment of which is … unlawful … is void."); *Kashani v. Tsann Kuen China Ent. Co.*, 118 Cal. App. 4th 531, 540 (2004) (illegal contract is an agreement that violates that law, or the policy of the law, and is void and unenforceable).

defendants' approval, documentation, accounting and reporting of the backdated stock options create a reasonable doubt that the challenged transactions were the product of valid business judgment. The Board was responsible for approving stock options, and in approving backdated options, the directors did not exercise valid business judgment and breached their fiduciary duties. ¶104. Further, the Compensation Committee was "specifically responsible under its charter for reviewing and approving grants of stock options ... to Infosonics insiders." ¶107. Under its charter, this committee was to "discharge the responsibilities of the Board of Directors ... relating to compensation of the Company's officers" and was to "establish and administer," as well as recommend to the Board, incentive and equity-based compensation plans for executives. *Id*. The directors on this committee – Marx, Picow and Waldron – constituted a majority of the Board, held their positions at all relevant times hereto, and had a duty to review and grant stock options granted to Infosonics officials during their tenures. ¶103, 107. They sat on the Audit Committee as well. ¶105. Marx and Waldron also were the Company's designated accounting experts. ¶105(d).

The relevant stock option plan required that all stock options granted to Company insiders could not have been less than the fair market value of the underlying common stock on the date the incentive options are granted. ¶¶24, 70. Nevertheless, Marx, Picow and Waldron approved no fewer than 185,000 backdated stock options. ¶26. They approved an award of 25,000 and 50,000 of the Options to Ram and Rosler, respectively. *Id*. But the misconduct went beyond mere approval of the transactions. Marx, Picow and Waldron also awarded each of themselves 15,000 Options. ¶26. Further, all of the directors reported their Options late in violation of SEC regulations. ¶26. *See* 17 C.F.R. § 240.16-a3(g)(1) ("Form 4 must be filed before the end of the second business day following the day on which the subject transaction has been executed."); *Howard v.Everex Sys., Inc*., 228 F.3d 1057, 1061-62 (9th Cir. 2000) (SEC reporting requirements "are clear and unequivocal, and they are satisfied only by the filing of complete, accurate and ***timely*** reports.").[9]

---

[9] *See also id*., quoting H.R. Rep. No. 1383, 73rd Cong., 2nd Sess., p. 13 (1934) ("'The hiding and secreting of important information obstructs the operation of the markets as indices of real value …. Delayed, inaccurate and misleading reports are the tools of the unconscionable market operator and the recreant corporate official who speculates on inside information.'")

Defendants claim that all of this reduces to allegations that the Options were granted at the lowest price during Plaintiffs' "conveniently chosen" period, and that they were reported late. Defs.' Mem. at 12. But Plaintiffs have pointed to "specific grants, specific language in option plans, specific public disclosures, and supporting empirical analysis to allege knowing and purposeful violations of shareholder plans and intentionally fraudulent public disclosures." *Ryan*, 2007 WL 416162, at *9. Such allegations are far more specific than those criticized in *Silicon Graphics* or *Werbowsky*. *See* Defs.' Mem. at 9, 12, citing *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 990 (9th Cir. 1999), and *Werbowsky*, 321 Md. at 619.

Defendants also argue that "Plaintiffs do not explain how the choice of grant date or late filing of Form 4s demonstrates collusion amongst members of the Board." Defs.' Mem. at 12. But with the purported grant date, the timing of the filings and stock price trends support a reasonable inference of backdating.[10] On January 3, 2006 – the day defendants were to report the Options – the Company's stock price had increased to $17.33. ¶26; *see* Def.'s Ex. F at 109. By Friday, January 13, 2006 – the last business day before the defendants filed their SEC Form 4s on January 17, 2006 – the price had climbed to $23.25.[11] ¶ 26; *see* Def.'s Ex. F at 109. During these ten days, the price of the Company's stock had increased by $5.92, or an increase of over 43 percent. If the options had been granted within two business days before the majority of the recipients filed their Form 4s on January 17, the options would have been valued at either $22.00 (January 12, 2006) or $23.25 (January 13, 2006) – a difference of $5.76 and $7.01, respectively, from the purported grant date price of $16.24. *See* ¶26; Def.'s Ex. F at 109. Such price differentials are material.[12] These highly particularized facts lead to the reasonable inference that at some point during the 10-day period between the date

---

[10] Plaintiffs do not contend, as defendants suggest, that the untimely Form 4s "form the basis for a cause of action." *See* Defs.' Mem. at 15, citing *Haberman v. Murchison*, 331 F. Supp. 180, 184 (S.D.N.Y. 1971). The untimely filings, taken as a whole with other specific allegations, merely support a reasonable inference that defendants knowingly approved and received backdated options.

[11] Dr. Martin Luther King's holiday was celebrated on Monday, January 16, 2006.

[12] For example, Rosler received 50,000 of the backdated options. ¶26. With a purported price of $16.24, it would cost him a total of $812,000 to exercise the options. *Id.* At a price of $22.00, it would cost him $1.1 million to do so, and at $23.25, a full exercise would cost him $1,162,500.

defendants should have reported the Options and the day that they actually did, the members of the Compensation Committee, separately or in collusion with others, retroactively chose a date of December 30, 2005 for the Options to improperly maximize their personal gain. *See Ryan*, 2007 WL 416162, at *8, n.34 ("this Court is ***required*** to draw reasonable inferences and ***need not be blind to probability*** … Given the choice between improbable good fortune and knowing manipulation of option grants, the Court may reasonably infer the latter, even when applying the heightened pleading standards of Rule 23.1.").[13] Such an inference raises a reasonable doubt that these actions constitute a valid exercise of business judgment. *Id*.

Thus, the facts alleged here "provide sufficient particularity in the pleading to survive a motion to dismiss for failure to make demand pursuant to Rule 23.1." *Id*. *See In re Tyson Foods, Inc*., No. 1106-N, 2007 WL 416132, at *18 (Del. Ch. Feb. 6, 2007) ("all backdated options involve a fundamental, incontrovertible lie: directors who approve an option dissemble as to the date on which the grant was actually made").[14] *See also Sanders v. Wang*, No. 16640, 1999 WL 1044880, at *5 (Del. Ch. Nov. 8, 1999) (demand excused because board's violation of shareholder-approved stock ownership plan was not a "valid exercise of business judgment"); *Coulter*, 2002 WL 31888343, at *11 (board action to reprice stock options was *ultra vires* unprotected by business judgment rule);

---

[13] Defendants' arm-chair quarterback arguments that these options "have long gone under water" (*i.e*., when the strike price of the option is higher than the market price of the underlying stock) or that the untimely filings were later mentioned in the Company's April 2006 proxy statement (Defs.' Mem. at 15-16) miss the point. Defendants engaged in substantial wrongdoing by approving, receiving and misreporting the backdated options. The later proxy disclosures failed to provide any context so that a reasonable stockholder could have grasped the significance of the untimely filings.

[14] A recent case from the Northern District of California lends no support to defendants. *See In re Linear Tech. Corp. Derivative Litig*., No. C-06-3290, 2006 WL 3533024 (N.D. Cal. Dec. 7, 2006). First, this decision's rather brief analysis is at odds with *Ryan* and, and to that extent, should be disregarded. Second, the *Linear* defendants conceded that two directors who received backdated stock options were "interested" for purposes of demand; the other four directors who sat on the Compensation Committee in that case did not receive such options. *Id*. at *2. Here, in contrast, the directors who sat on the Compensation Committee approved ***and received*** backdated options, and are interested under the concession made in *Linear*. Third, *Linear* found that "the ***only*** factual allegation offered by plaintiffs is that on seven occasions over a period of seven years, stock options were dated 'just after a sharp drop' in Linear's stock and 'just before a substantial rise.'" *Id*., at *3. Plaintiffs here allege far more, including an analysis of the timeframe, how the backdating affected the Options' strike price, and how the late reporting supports an inference of backdating. *See* ¶¶25-26, 36-42, 92. Moreover, while *Linear* found that the plaintiffs had failed to demonstrate how the approvals of backdated options harmed the company, Plaintiffs allege a myriad of damages suffered and to be suffered that arise out of the Options. *See* ¶¶13-15, 50, 59-63, 95-96.

*Nuveen*, 1996 WL 328001, at *5 (where a plaintiff pleads "particularized facts that raise a reasonable doubt that the challenged conduct was *ultra vires*, then he or she has satisfactorily pled futility"); *Halpern v. Armstrong*, 491 F. Supp. 365, 377 (S.D.N.Y. 1980) (the Board, "having chosen to circumscribe [its] statutory powers over the plan and having so announced to all and sundry, [was] not entitled to act in disregard of these representations to the public and shareholders.").

Therefore, actions by Marx, Picow and Waldron to approve, receive and untimely report the Options raise a reasonable doubt that their actions fall within the ambit of the business judgment rule. Because they are a majority of the directors, their actions must be imputed to the entire Board, whose other members also untimely reported their receipt of the Options. *Ryan*, 2007 WL 416162, at *8, *10 ("Plaintiff alleges that three members of a board approved backdated options, and another board member accepted them. These are sufficient allegations to raise a reason to doubt the disinterestedness of the current board and to suggest that they are incapable of partially considering demand."). Thus, there is a reasonable doubt that a majority of the Infosonics' Board "are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." *Werbowsky*, 362 Md. at 620. Demand on the Board, therefore, was futile and excused.

**2. Marx, Picow and Waldron are not disinterested due to their breaches of fiduciary duties as Audit Committee members**

Demand is futile when directors violate their fiduciary duties of care, loyalty and good faith by completely abdicating their responsibility to ensure the integrity of the Company's reporting process and consequent results. *In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. 117, 128-29 (D.N.J. 1999). Plaintiffs' specific allegations fit flush within this standard.

Here, Plaintiffs allege that Marx, Picow and Waldron directly participated in the related schemes to backdate stock options and misclassify the warrants. As Audit Committee members (¶105), they were to meet "as often as necessary, at least on a quarterly basis." ¶105. Each had a duty to make ***timely*** efforts gather, compile, assimilate, analyze, understand and disseminate to the Board as appropriate "all critical accounting policies to be used" and "all alternative treatments of financial information within GAAP" that then related to the issuance of the warrants. ¶105(a). They

also were to work with the independent auditors in a timely and effective manner to ensure proper accounting for the warrants, as well as to ensure that the Company had implemented adequate internal financial controls to prevent the backdating of stock options. ¶105. Marx and Picow, as this committee's designated experts, were subject to heightened duties of care and loyalty. ¶105(d). *See In re Emerging Commc'ns, Inc. S'holders Litig.*, No. 16415, 2004 WL 1305745, at *1, *39-*40 (Del. Ch. May 3, 2004) (director with significant finance experience has increased duty of care and may be liable for less egregious conduct as such experience implies a greater understanding of the consequences of inappropriate conduct). The proper discharge of these duties was critical to the proper financial treatment, documentation and reporting of the private equity offering of January 30, 2006 – an event of major importance to the Company. ¶105(c)(i).

The complaint alleges that Marx, Picow and Waldron violated their fiduciary duties as Audit Committee members. With regard to the Options, they failed to inform themselves of the circumstances surrounding the backdating, failed to ensure adequate internal controls to prevent such activity and the dissemination of false and misleading financial statements. ¶¶105-106, 110, 114. They also approved a report in the 2006 proxy (Defs.' Ex. G at 143-144) indicating that they had recommended including the audited financial statements for fiscal year 2005 in the Company's Form 10-K, which included the false characterization of the Options. ¶69. They approved and signed that form as well. ¶91. Such conduct subjects these directors to a substantial likelihood of liability.[15]

Defendants claim that "Plaintiffs do not allege any particularized facts suggesting that any Infosonics directors – let alone a majority of them – were aware of or participated in any stock option backdating, or ignore any 'red flags' ...." Defs.' Mem. at 11. But Marx, Picow and Waldron sat on the Compensation Committee that approved the Options. All of them received the Options and untimely reported them to the SEC. As the *Ryan* court noted, their knowledge is apparent:

[15] *See, e.g. In re Phillip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004) ("it 'comport[s] with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report'"); *In re Livent Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 437 (S.D.N.Y. 2001) ("An outside director and audit committee member who is in a position to approve a corporation's financial statements can be presumed to have 'the power to direct or cause the direction of the management and policies of' the corporation, at least insofar as the 'management and policies' referred to relate to ensuring a measure of accuracy in the contents of company reports and SEC registrations that they actually sign.").

> Defendants also object that plaintiff's allegations are not particularized for purposes of Rule 23.1 because they do not directly allege knowledge on behalf of the directors. Yet, it is difficult to understand how a plaintiff can allege that directors backdated options without simultaneously alleging that such directors knew that the options were being backdated. After all, any grant of options had to be approved by the committee, and the committee can reasonably be expected to know the date of the options as well as the date on which they actually approve a grant. Nor is it any defense to say that directors might not have had knowledge that backdating violated their duty of loyalty. Directors of Delaware corporations should not be surprised to find that lying to shareholders is inconsistent with loyalty, which necessarily requires good faith.

*Ryan*, 2007 WL 416162 at *9 n.35. In a similar shareholder derivative action involving "spring loaded" stock options, the Delaware Chancery Court opined that a director's alleged awareness of manipulated stock options was inconsistent with his or her fiduciary duties:

> Plaintiffs allege that defendants knowingly spring-loaded options to key executives and directors while maintaining in public disclosures that such options were issued at market rates. Such partial, selective disclosure-if not itself a lie, certainly exceptional parsimony with the truth-constitutes an act of "actual artifice" that satisfies the requirements of the doctrine of fraudulent concealment…. ***It is difficult to conceive of an instance, consistent with the concept of loyalty and good faith, in which a fiduciary may declare that an option is granted at "market rate" and simultaneously withhold that both the fiduciary and the recipient knew at the time that those options would quickly be worth much more.*** Certainly at this stage of the litigation, plaintiffs are entitled to the reasonable inference of conduct inconsistent with a fiduciary duty.

*Tyson Foods*, 2007 WL 416132, at *17.

With regard to the misclassified warrants, the June 2006 press release conceded that the Audit Committee failed to adequately investigate and review available literature in a ***timely*** manner. ¶105(a). The press release reflected an after-the-fact analysis that could and should have taken place well in advance of the private equity offering announced on January 30, 2006, and certainly in advance of February 17, 2006, when the SEC declared the registration statement to be effective. *Id*. It is thus reasonable to infer that "Infosonics suffered from the untoward effects of an Audit Committee that met only sporadically and that was staffed by members who had devoted patently inadequate time to their responsibilities." ¶105(a).[16] The complaint also alleges that Marx, Picow and Waldron consciously chose to maintain the improper classification of the warrants. ¶105(b). This inference is

[16] *See Guttman v. Huang*, 823 A.2d 492, 507 (Del. Ch. 2003) (sufficient pleading includes allegation that "the company had an audit committee that met only sporadically and devoted patently insufficient time to its work, or that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation.").

reasonable given that all of them had engaged in self-dealing by receiving backdated options and were motivated to inflate the Company's financial picture to increase the value of those warrants.

Thus, there is reason to doubt whether Marx, Picow and Waldron were disinterested because they face a sufficiently substantial likelihood of liability. *See Ryan*, 2007 WL 416162, at 10, n.38 (audit committee members were "directly responsible for approving any false financial statements that resulted from mischaracterization of [the] option grants" and, thus, "might be exposed to potential criminal liability for securities fraud, tax fraud, and mail and wire fraud"). *See also Seinfeld v. Barrett*, No. 05-298, 2006 WL 890909, at *5-*6 (D. Del. Mar. 31, 2006) (allegation that compensation committee misstated executive incentive bonuses, among other things, established futility of demand); *Cendant*, 189 F.R.D. at 125 (demand found futile in part because it was the audit committee's responsibility to catch and correct accounting irregularities); *Mitzner v. Hastings*, No. C-04-3310, 2005 WL 88966, at *5-*6 (N.D. Cal. Jan. 14, 2005) (applying Delaware law, audit committee membership during a relevant period may be sufficient to hold directors liable for conveying allegedly false or misleading information in annual reports and press releases). Thus, any demand on Marx, Picow and Waldron would have been futile.

**3. Ram and Rosler are not independent or disinterested**

In addition to their problematic involvement with the Options and warrants, demand would have been futile on Ram and Rosler for the following reasons:

- ***Remuneration as corporate insiders***. The complaint alleges that Ram founded the Company and, as its Chairman, CEO and director, received cash compensation of over $440,000 and 25,000 stock options in fiscal year 2005. ¶36. As the Company's Executive Vice President and a director, Rosler received over $200,000 in cash compensation and 140,000 stock options that year. ¶39. Given these allegations, it is improbable that either of them could have objectively considered a demand. *See Mizel v. Connelly*, No. 16638, 1999 WL 550369, at *1, *3 (Del. Ch. July 22, 1999) ("Since [employee-directors] each derive their principal income from their [corporate] employment ... it is doubtful that they can consider the demand on its merits without also pondering whether an affirmative vote would endanger their continued employment."); *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 275 (S.D.N.Y. 2006) (Chairman/CEO's "interest

was of 'a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform [his] fiduciary duties without being influenced by [his] overriding personal interest.'") (original brackets).

- ***Improper insider trading***. Demand is futile when "plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition." *Guttman*, 823 A.2d at 502. As discussed above, Plaintiffs have adequately pleaded that Ram and Rosler violated California Corporations Code section 25402 because they were aware of material non-public information about the Options and misclassified warrants at the time they sold their shares. The timing of the sales is also suspicious. Before their sales a few weeks before the June 12, 2006 restatement (May 11 and 24, 2006), they had never sold any shares, and each realized hundreds of thousands of dollars from the sales. *See* ¶36 (Ram), ¶39 (Rosler); ¶98. Rosler sold 15,000 shares on the date the restatement was announced. ¶98. These sales occurred during a time in which it may be inferred that they, together with the Audit Committee members, were considering whether, how and when to disclose the looming restatement. Such allegations are sufficient to raise a reasonable doubt as to the disinterestedness of the selling defendants.[17]

Defendants assert that Ram and Rosler (along with Klausner) had adopted "pre-arranged" stock trading plans under Rule 10b5-1 that removed their individual "discretion or control over the timing of such stock sales and option exercises." Defs.' Mem. at 14. As such, defendants claim that the sales by these three defendants were "not suspicious." *Id*. at 15 (*citing In re Netflix, Inc. Sec. Litig*., No. C04-2978 FMS, 2005 WL 1562858, at *8 (N.D. Cal. Jun. 28, 2005)). These plans provide no defense to charges of improper insider selling at the pleadings stage, however.

First, a person must adopt a 10b5-1 plan ***before*** becoming aware of material nonpublic

[17] *See Strougo v. Carroll*, No. 8040, 1991 WL 9978, at *3 (Del. Ch. Jan. 29, 1991) (directors who allegedly engaged in insider trading were interested). *See also In re Legato Sys. Inc. Derivative Litig*., No. 413060, Order (San Mateo Super. Ct. July 20, 2001) (Simerlein Decl. Ex. B); *In re Transmeta Corp. Derivative Litig*., No. 799491, Order (Santa Clara Super. Ct. July 23, 2002) (Simerlein Decl. Ex. C).

information. 17 C.F.R. § 240.10b5-1(c)(1)(i)(A). Here, each plan was adopted on March 14, 2006 – well after the option backdating, and almost a month after the warrants should have been reclassified on February 17, 2006. *See* Defs.' Ex. I at 194; J at 205, and K at 216. By the time each plan was adopted, it was too late, because each of these defendants were then aware of material, nonpublic information relative to the backdating and misclassified warrants. Second, because the plans were adopted when it may be inferred that Ram and Rosler were aware of material non-public information, it is improper to take judicial notice of them – despite the fact that each plan was disclosed in a publicly-filed document. *See In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 734 & n.58 (S.D. Ohio 2006) (noting that the "timing of the plan is crucial" and refusing to take judicial notice of it). Indeed, the timing of the plans supports an inference that these defendants adopted them to whitewash the Options with a patina of 10b5-1 plan legitimacy.[18] It also is not clear (and cannot be made clear at this point) whether the plans cover the Options. For example, Rosler's plan (Defs.'s Ex. J at 197) does not allude to the Options. Thus, Plaintiffs object to taking judicial notice of defendants' exhibits I through R, as consideration of these documents would involve the weighing of factual disputes that is inappropriate at this stage. *See Cardinal Health*, 426 F. Supp. 2d at 734 & n.48; *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 995 (S.D. Cal. 2005).

**4. The demand futility allegations must be construed together**

Predictably, defendants heavily parse a number of demand futility allegations as insufficient. *See, e.g.*, Defs.' Mem. at 13, 17-18. But this Court must ***examine the entire Complaint as a whole*** and not focus on isolated allegations. *See Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990). Even if an isolated allegation would be insufficient to raise a reasonable doubt regarding a director's independence, the totality of the allegations may be enough. *Int'l Equity Capital Growth Fund, L.P. v. Clegg*, 1997 WL 208955, at *5 (Del. Ch. 1997); *Coulter*, 2002 WL 31888343, at *9. *Compare*

[18] As the Director of the SEC's Division of Enforcement recently noted, studies suggest that this rule is being abused. *See* L. Chatman Thomsen, *Speech by SEC Staff: Remarks at the 2007 Corporate Counsel Institute* (Mar. 8, 2007), http://www.sec.gov/news/speech/2007/spch030807lct2.htm (Simerlein Decl. Ex. D). *See also* Jane Sasseen, *Insiders With A Curious Edge*, Bus. Week Online, (Dec. 18, 2006), http://www.businessweek.com/print/magazine/content/06_51/b40145.htm?chan=gl (Simerlein Decl. Ex. E), A. D. Jagolinzer, *Do insiders trade strategically within the SEC Rule 10b5-1 harbor*? (Dec. 2006) (unpublished comment, on file with the Stanford University Graduate School of Business) (Simerlein Decl. Ex. F).

*Lewis v. Curtis*, 671 F.2d 779, 785 (3d Cir. 1982) (allegation that "directors 'would be suing themselves' is not ***alone*** sufficient to excuse demand"). Thus, allegations that directors would refuse to sue each other (¶112, 115, 117),[19] have failed to file any lawsuits to recover damages (¶116, 119), would be concerned about a lack of insurance coverage if they had to sue themselves (¶118), and that demand on the shareholders was impracticable (¶120) can be less persuasive only in isolation. Taken as a whole, these allegations – along with the others in the complaint – plainly raise a reasonable doubt as to the disinterestedness of the Board.

## IV. PLAINTIFFS HAVE ALLEGED A VALID CLAIM FOR ILLEGAL INSIDER TRADING UNDER CALIFORNIA CORPORATIONS CODE § 25402

Defendants argue that Plaintiffs' claim for violations of California Corporations Code section 25402 "fails to state a claim for insider trading under Maryland law." Defs.' Mem. at 22. They also claim that Plaintiffs fail to allege that the defendants who sold their stock did so on the basis of having specific material, nonpublic information, and also point to the 10b5-1 plans to exonerate the conduct. *Id*. As already noted above, these latter contentions uniformly lack merit.

Contrary to defendants' assertion, the "internal affairs doctrine" does not bar derivative claims against defendants for insider selling in violation of section 25402. *See Friese v. Super. Ct.*, 134 Cal. App. 4th 693 (2005), *cert. denied*, 127 S.Ct. 138 (2006). In *Friese*, a trustee, as the successor-in-interest to a Delaware corporation doing business in California, alleged that certain officers and directors of that company violated section 25402 by selling company shares while in possession of material, adverse, nonpublic information. *Id*. at 700 n.4. The trustee also claimed that two of the defendants violated California Corporations Code section 25403(a) by "controlling and inducing the sale of company stock in violation of the Corporations Code."[20] *Id*. Like Plaintiffs

---

[19] *See also Dollens v. Zionts*, No. 01 CO2826, 2002 WL 1632261 (N.D. Ill. July 22, 2002) (applying Delaware law) ("Common sense suggests that, at a board meeting at which plaintiff's demand might be considered, the defendant directors' interest in their own alleged wrongdoing would affect their decisions as to whether to sue their co-directors for the same alleged wrongs."); *Kohls v. Duthie*, 791 A.2d 772, 782-83 (Del. Ch. 2000) (holding that there was a reasonable doubt regarding the impartiality of a director who knowingly assisted another director in committing bad faith conduct).

[20] Defendants' motion purports to move to dismiss Plaintiffs' claim under section 25403 (count IV of the complaint), but their supporting memorandum does not brief this point. The motion also purportedly addresses the following counts, but similarly lacks any briefing: count II (violations of section 14(a) of the Securities and Exchange Act of 1934); VII (abuse of control); VIII (gross

here, the trustee alleged that those defendants were liable for up to three times the amount that they earned from the insider selling under California Corporations Code section 25502.5. *Id*. at 697. The defendants, however, claimed that the internal affairs doctrine, as codified in California Corporations Code section 2116, prevented them from being held liable under section 25502.5. *Id*. at 697-98.

The *Friese* court disagreed, holding that "[g]iven the public and regulatory interests section 25502.5 serves, it is not subject to the internal affairs doctrine as codified in section 2116." 134 Cal. App. 4th at 710. After examining the internal affairs doctrine in the context of a long history of California legislation intended to protect its citizens from improper buying or selling of corporate stock, *Friese* found that the insider trading laws at issue were not "merely a device for enforcing directors' and officers' fiduciary duties to shareholders." *Id*. at 709. Instead, the court found that the state's insider trading laws vindicate far broader public policies and were "adopted as a means of protecting investor confidence in the securities market and more broadly as a means of punishing what is perceived by the public as immoral conduct." *Id*. at 709-10.[21]

Plaintiffs do not ask this Court to disregard the internal affairs doctrine to reach across state lines to tell an out-of-state corporation how to order relationships with its directors, officers, and shareholders. California's insider trading prohibitions are triggered only when a person engages in prohibited conduct to the detriment of the state's securities marketplace and its citizens. Maryland law thus does not bar Plaintiffs' insider selling claims. Indeed, it is doubtful that either the Maryland courts or legislature would give the directors or officers of its corporations a green light under the internal affairs doctrine to lie to stockholders and, in turn, profit from those lies.

---

mismanagement); IX (waste); X (unjust enrichment); XI (accounting); XII (rescission); XIII (constructive trust). Plaintiffs maintain that these claims are valid and request leave to file supplemental briefing to the extent the Court seriously considers a dismissal of these counts.

[21] In so holding, *Friese* was highly critical of the only reported decision that found to the contrary. *Id*. at 708-09 & n.6, citing *In re Sagent Tech., Inc. Derivative Litig.*, 278 F. Supp. 2d 1079, 1090 (N.D. Cal. 2003). *Friese* stated that *Sagent* failed to consider applicable state court decisions "or the other authorities which have consistently found that a state's corporate securities laws are not subject to the internal affairs doctrine. Moreover, the court in *Sagent* did not discuss the history or purpose of California's insider trading prohibitions. For these reasons *Sagent* is not persuasive authority for limitation of those securities laws to securities issued by domestic corporations." *Id*.

## V. PLAINTIFFS HAVE STANDING TO ASSERT A CLAIM UNDER SECTION 304 OF THE SARBANES-OXLEY ACT

Under section 304 of the Sarbanes-Oxley Act of 2002 ("SOX"), if an issuer of stock is required, as a result of misconduct, to prepare an accounting restatement due to the material non-compliance of the issuer on a financial reporting requirement, then the issuer's CEO and CFO shall reimburse the issuer for any bonuses, incentive-based compensation, or equity-based compensation they received. 15 U.S.C. §7243. As discussed above, Infosonics restated its financial results for the first quarter of fiscal year 2006 as a result of the misclassified warrants, and Plaintiffs have alleged the restatement was due to defendants' misconduct. Ram and Klausner, as the Company's CEO and CFO, respectively, must therefore reimburse Infosonics for all bonuses, incentive-based compensation, or equity-based compensation received from the Company attributable to that period.

Defendants contend, however, Plaintiffs have no standing to bring such a claim and cite to a number of decisions that have held a private right of action under section 304 does not exist. Defs.' Mem. at 19-21. Plaintiffs acknowledge these opinions – none of which are binding on this Court – and respectfully disagree. Based on the language, structure and legislative history of section 304, Plaintiffs contend that such a right may be fairly implied.

### A. The Text and Structure of § 304 Supports an Implied Private Right of Action

To discern Congressional intent, courts look to the statute's plain language and structure. *See Crowley Marine Servs., Inc. v. Maritrans Inc.*, 447 F.3d 719, 725 (9th Cir. 2006) ("The plain language of the statute is our starting point."); *Currier v. Potter*, 379 F.3d 716, 725 (9th Cir. 2004) (absent express statutory language conferring a private remedy, courts look to "statutory structure, or some other source"). Here, section 304 codifies the equitable remedy of disgorgement, which creates a presumption in favor of an implied private right of action where, as here, congressional intent is silent or ambiguous. *See First Pac. Bancorp., Inc. v. Helfer*, 224 F.3d 1117, 1125-26 (9th Cir. 2000) (finding an implied private right of action for an accounting under 12 U.S.C. § 1821(d)). *Helfer* has been distinguished by another department of this Court. *See Kogan v. Robinson*, 432 F. Supp. 2d 1075, 1081 (S.D. Cal. 2006) (finding that while section 1821(d) provided no means of enforcement, section 304 is enforceable by the SEC).

That the SEC may enforce section 304, however, is not dispositive. *See, e.g.*, *Schwier v. Cox*, 340 F.3d 1284, 1296 (11th Cir. 2003) (in construing 42 U.S.C. § 1971, a voting rights statute, court stated that "neither § 1971's provision for enforcement by the Attorney General nor Congress's failure to provide for a private right of action expressly in § 1971 *require* the conclusion that Congress did not intend for such a right to exist.") (original italics). And as the *First Pac. Bancorp* court noted, while public entities were authorized to enforce section 1821(d), none had done so, leading the Ninth Circuit to refuse to "assume that Congress intended to strip away our power to do equity in the absence of other specific statutory language or a 'necessary and inescapable inference' from the language of the statute." 224 F.3d at 1125. Similarly, the SEC apparently has not chosen to enforce section 304's equitable remedy of disgorgement.[22]

As to its structure, Section 304 is flanked by section 303 (which expressly reserves enforcement to the SEC) and section 306 (which requires a derivative plaintiff to first make a demand on the issuer). Section 304 does not expressly authorize nor proscribe a private right of action, nor reserve enforcement to the SEC. Courts have construed section 306's demand requirement to create a private right of action, and the absence of any like language in section 304 has persuaded them to decline to imply such a right into section 304. *See, e.g.*, *Kogan*, 432 F. Supp. 2d at 1081-82. This analysis, however, misconstrues the demand requirement of section 306 and fails to account for the SEC's express right of enforcement in SOX section 303.

Section 306 of SOX allows an issuer to recover any profit by a director or executive officer who purchases or sells "any equity security of the issuer (other than an exempted security) during any blackout period with respect to such equity security ...." 15 U.S.C. § 7244(a)(1), (a)(2)(A). No scienter is required because the issuer has an absolute right under this statute to any such profits. *Id.* Section 306 allows a derivative action only "if the issuer fails or refused to bring such action within

---

[22] *See, e.g.*, Nina Locker & Peri Nelson, *Ambiguity Deters Claims Pursuit: Practicalities May Make Section 304 More Trouble Than It's Worth*, S.F. Daily J. (Aug. 10, 2005), *available at* http:www.wsgr.com/PDFSearch/section 304_0805.pdf (noting that as of that date, the "SEC ha[d] not filed any enforcement actions or administrative proceedings seeking disgorgement under § 304 [and] [c]onsequently, it would appear that the SEC will look to issuers to enforce Section 304"). Thus, the SEC undertook enforcement despite 971 restatements in 2005. Greg Farrell, *Restatements of earnings in 2005 to break record*, USA Today (Dec. 30, 2005) (Simerlein Decl. Ex. G).

60 days after the date of request, or fails diligently to prosecute the action thereafter." 15 U.S.C. § 7244(a)(2)(B). In contrast, SOX section 303 expressly proscribes a private right of action. Section 303(a) prohibits officers or directors from "fraudulently influenc[ing], coerc[ing], manipulat[ing], or mislead[ing]" independent auditors. 15 U.S.C. §7242(a). Further, "[i]n any civil proceeding, the Commission shall have exclusive authority to enforce this section." 15 U.S.C. §7242(b).

Thus, it is reasonable to infer that Congress intended for Rule 23.1's demand futility provisions to control private actions under section 304. If directors are capable of fielding a demand, a derivative plaintiff should not interfere with their business judgment that a restatement was or was not the result of misconduct. *Kamen,* 500 U.S. at 101. Section 306 requires a demand because Congress recognized that, under a strict liability statute, an issuer's directors cannot hide behind a subjective business judgment rule. While section 304 omits such language, it also does not expressly reserve enforcement to the SEC. The presence of such language in section 303 demonstrates that Congress knew how to do so, and could have included similar language in section 304. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994).[23]

**B. Relevant Legislative History Supports an Implied Right of Action**

Where a statute's plain language fails to resolve ambiguity, legislative history may provide clarification. *See Bates v. United Parcel Serv., Inc.*, 465 F.3d 1069, 1082 (9th Cir. 2006). The history of SOX supports an implied private right under section 304 because Congress rejected alternative language that would have expressly limited enforcement of this provision to the SEC.[24] *See I.N.S. v. Cardoza-Fonseca,* 480 U.S. 421, 442-43 (1987) ("'Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.'"). Similarly, Senator Boxer introduced an amendment to have the SEC exclusively enforce disgorgement remedies, but

[23] As all three of these sections share a common purpose – issuer reimbursement – it is not reasonable to draw a laser-beam focus on section 306 to the exclusion of section 303 to avoid finding a private right under section 304. *See Neer v. Pelino,* 389 F. Supp. 2d 648, 652 (E.D. Pa. 2005).

[24] *See The Corporate and Auditing Accountability, Responsibility and Transparency Act of 2002*, H.R. 3673, 107th Cong. §12(a) & (b) (2002) ("House Bill") (Simerlein Decl. Ex. H).

the Senate rejected it. Instead, Congress omitted any provision forbidding a private right of action,[25] and such action was not accidental. *See AT&T Corp. v. FCC*, 369 F.3d 554, 560-61 (D.C. Cir. 2004) (finding that Congress' decision to exclude provision from statute undermined any argument that the provision was implicitly contained in statute's final version). The legislative history thus supports the implication of a private right of action under section 304. Congress created a statutory provision where the customary legal incidents of reimbursement imply that a private suit for disgorgement would be available to issuers and those suing on issuers' behalf. *See Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979).[26]

## VI. CONCLUSION

Plaintiffs have pleaded sufficient particularized facts to show that demand on the Infosonics Board would have been a futile and useless act, and have adequately alleged their claims for relief. It is respectfully requested, therefore, that the Court deny defendants' motion to dismiss.[27]

DATED: March 26, 2007

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
STEVEN J. SIMERLEIN

By: /s/ Steven J. Simerlein
STEVEN J. SIMERLEIN

610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@ruflaw.com
ssimerlein@ruflaw.com

---

[25] *See* 148 Cong. Rec. S6660 (July 11, 2002) (S.A. 4220) (Simerlein Decl. Ex. I).

[26] A complete presentation of Plaintiffs' arguments in support of a private right of action would consume more pages than authorized under the local rules. If the Court concludes that this discussion merits fuller development, Plaintiffs request leave to submit supplemental briefing on this point.

[27] Plaintiffs believe that they have adequately pleaded demand futility and their causes of action to move forward with this litigation. In the event the Court grants the motion to dismiss, however, leave to amend the complaint should be granted. *See U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir. 2001) ("leave to amend should be granted unless the district court 'determines that the pleading could not possibly be cured by the allegation of other facts'") *Broam*, 320 F.3d at 1028 ("Dismissal without leave to amend is proper only in 'extraordinary' cases."); Fed. R. Civ. Proc. 15(a) (leave to amend should be granted "when justice so requires").

JOHNSON BOTTINI, LLP
FRANK J. JOHNSON
FRANCIS A. BOTTINI, JR.
655 W. Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 230-5535
frankb@johnsonbottini.com

Attorneys for Plaintiffs